**People of the State of Illinois, Plaintiff-Appellee, v. James E. Lowe, Defendant-Appellant.**

Gen. No. 52,537.

First District, Fourth Division.

June 25, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Michael Stevenson, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant was tried and convicted at a bench trial of the crime of burglary. Judgment was entered and he was sentenced to a term of two to three years in the Illinois State Penitentiary. Defendant raises three points on appeal: (1) the trial court erred in allowing the State to introduce hearsay testimony of the arresting officer as to the identification of the defendant by the complaining witness; (2) he was denied a fair trial by the

State's use of an identification procedure that was inherently suggestive; and (3) he was not proven guilty beyond a reasonable doubt.

EVIDENCE

Testimony of Chiquita Winston, called by the State:

On June 30, 1966, she lived at 6318 South Langley in a first-floor apartment. At 2:00 that afternoon she received a telephone call from Mrs. Dunlap and she went straight home. At home she discovered that her apartment was in a state of disarray and that the locks on the front door had been jimmied.

She made an inspection of her property and found the following items missing: two watches, a diamond ring, $150–$200 in cash, and a new swimming suit. The bolt on the outside of her air conditioner had been screwed loose and the air conditioner had fallen onto the sidewalk outside the house. The value of all the items taken is about $1,000.

Testimony of Lucille Dunlap, called by the State:

On June 30, 1966, she lived on the second floor at 6318 Langley directly above Mrs. Winston's apartment. She is a school teacher. At about 2:00 that afternoon she heard a loud crash in the airway which she ascertained to have been made by Mrs. Winston's air conditioner falling out of her window. She ran out of her apartment and down the front. When she reached the vestibule she encountered a man coming out of the Winston apartment carrying a television set and a bag. The man she saw coming out of the Winston apartment is the defendant.

The man told her that he was a repairman. A face to face conversation ensued for five minutes and when she said that she was going to call Mrs. Winston, he just set the television down and sauntered off. He was wearing a red shirt and dark colored trousers. He was slightly

shorter than she and was wearing workman's gloves. Her son was there also.

On July 8, 1966, she had a conversation with Detective William Tolliver in her home. She looked at between twenty and fifty photographs and picked out one as the man whom she had seen coming out of the Winston apartment on June 30. She never viewed a lineup in regard to making an identification. The first time she saw the defendant after June 30 was at the trial.

Testimony of Samuel Dunlap, called by the State:

He is the son of Lucille Dunlap who testified previously. After he heard the noise of the air conditioner falling he went down the back stairs and came around to the gangway. He then proceeded to the front of the building where he saw his mother talking to a man who was carrying a television set and a little canvas bag.

On July 8, 1966, he also looked at the photographs brought by Detective Tolliver. He recognized one photograph as being that of the man whom he had seen carrying the television set. He is positive that the defendant is the man he saw with the television set. First his mother examined the photographs and then she handed them to him. He recognized defendant from one of the photographs. His mother looked at all of the photographs and selected one; he saw the picture that she selected. When he saw the photograph that she selected he went through all the others.

He does not remember what the defendant was wearing on June 30. He does not remember if defendant had a mustache. He does remember that defendant had a process (his hair had been straightened). He remembered that defendant had long hair. The man he saw in the hall was shorter than his mother.

He did appear in Felony Court and before the Grand Jury. He does not remember testifying before the Grand Jury that defendant ran from the scene after setting the television down.

402

Testimony of William Tolliver, called by the State:

He is a detective with the burglary section of the Chicago Police Department. He was assigned to investigate the burglary at 6318 South Langley. He went to the apartment of Mrs. Dunlap with about twenty photographs which he showed to Mrs. Dunlap and her son Sam. They both identified a picture of James E. Lowe.

The pictures shown Mrs. Dunlap and her son were of known burglars whom the witness or other officers in the unit had previously arrested or known burglars whose photographs had been obtained by witness's police unit. He got defendant's picture from another officer in his unit on July 7th or 8th. He did not know at the time that defendant was in the hospital although he had heard that defendant had been shot. He did not arrest defendant; defendant had been previously arrested. (There was no evidence as to when this occurred.) Defendant's picture seemed to show that his hair was long and that it had been straightened.

When Mrs. Dunlap and her son examined the pictures they were in the same room. She would view a photograph and then hand it to her son. She selected the defendant's picture and said that "this looks like the fellow here, I believe it is him." Her son was viewing some other pictures at that time, but he subsequently said the same thing.

At the Grand Jury hearing he had testified that the burglar had pulled a gun. He was not told that by either Mrs. Dunlap or her son; someone else told him that there had been a gun.

Testimony of James E. Lowe, defendant:

On the evening of June 29, 1966, he left Chicago to go to Detroit for the July 4th holidays. He returned on July 5, 1966; and he had remained continuously in Detroit for that time except for one day's sightseeing in Canada. They crossed a bridge in going from Detroit to Canada. He didn't remember going through a tunnel. He went to

403

Detroit with Mrs. Thelma Wells, her baby Theresa and Pete. He stayed at the house of a Mr. Kelly in Detroit.

He had been dismissed from another burglary charge when he was arrested for the present crime. The arrest was made in the courtroom where he was dismissed from the first charge.

He was not involved in the burglary which has been described. Other than the times he has been in court he has never seen the people who testified.

On July 6, 1966, he was shot at 6271 Champlain and was taken to the hospital. He ultimately went to Felony Court on a charge associated with that shooting and he was dismissed.

Testimony of Thelma Lee Wells, called by the defense:

On June 29, 1966, she left with defendant to go to Detroit. She was going to Detroit for her sister's birthday and defendant came along. They were accompanied by her six-year-old daughter Theresa and by Pete Fair. Her sister is Annabelle Kelly, and they stayed with Annabelle and her husband. They returned from Detroit on July 5, 1966. Defendant was continually in Detroit from June 29 until July 5. They did go to Canada; they went "through the tunnel, whatever it was, because it was dark and I remember we had to go through customs because everyone was searched."

Stipulation as to what the testimony of Pete Fair would be:

On June 29, 1966, he went with Mrs. Thelma Wells, her daughter Theresa and defendant to Detroit, where they all remained until July 5, 1966, when they returned to Chicago.

Testimony of Arnice Turner, called by the defense:

She is a daughter of Thelma Wells who testified previously. She knows the defendant. On June 29, 1966, he was living with her family at 5231 Calumet. At about

404

9:00 that evening defendant got into a car with her mother, her sister Theresa and Pete Fair. Her mother returned on July 5, 1966. During the time they were gone she stayed at a friend's house.

She spoke to her mother over the telephone between June 29 and July 5. She called her mother at the house of her mother's sister (Annabelle Kelly) in Detroit.

She did not see defendant between June 29 and July 5. During that period she returned to her home on Calumet several times and did not see the defendant.

OPINION

■ Defendant first argues that the trial court erred in allowing the State to introduce hearsay testimony of the arresting officer as to the identification by the complaining witness. The objectionable testimony occurred when Officer Tolliver was asked if any of a group of twenty photographs was singled out by Mrs. Dunlap and her son. He replied that they both identified the photograph of the defendant. This is clearly hearsay because the testimony of the officer summarizing a conversation with Mrs. Dunlap and her son was obviously offered to strengthen their identification of defendant. People v. Smith, 105 Ill App2d 8, 12, 245 NE2d 23.

■ Although the statement at trial of Officer Tolliver is hearsay and the defense attorney's objection should have been sustained, we find that the statement was merely cumulative of the previous testimony of Mrs. Dunlap and her son and was not prejudicial to defendant. People v. James, 109 Ill App2d 328, 248 NE2d 777.

Defendant argues secondly that he was denied a fair trial by the State's use of an identification procedure that was inherently suggestive. Defendant cites Simmons v. United States, 390 US 377, in support of his argument that photographic identification may give rise to irreparable misidentification; and so it may. But the Simmons case also notes that each case must be decided on its own

particular facts; and in Simmons the photographic identification was found to be proper with the court noting that the perpetrators of the crime were still at large when the identification was made and that there were several independent identifications made. The defendant argues from these two noted facts in Simmons that his identification was improper because, first, he was in police custody at the time that the identification was made and, second, because Mrs. Dunlap and her son were together when they identified his photograph and thus did not make independent identifications.

█ Defendant contends that he was in police custody at the time that the photographic identification was made and that therefore the identification is in some manner faulty. This argument ignores the fact that on July 8, 1966, this crime was still in its investigatory stage and that if defendant was in custody it was in connection with some other crime. As far as the police knew, the perpetrator of the crime was still at large and thus they were following their usual investigatory patterns.* Additionally, according to defendant's testimony he was in the hospital from July 6 to August 19; to the best of his knowledge he was not under arrest; he had been shot on

---

* Defendant quotes from Patrick Wall's book "Eye Witness Identification in Criminal Cases" to support his theory that defendant was not "at large." However, in that article the author distinguished between showing photographs before arrest and after arrest. He stated:

In a later case, the court made clear the distinction between showing photographs when no suspect is known and showing them after an arrest has been made or a particular person is already a suspect. There the court condemned as "indefensible" the conduct of the police in showing photographs to witnesses after the accused had been arrested, and quashed the conviction. The court later learned that the photographs had been shown prior to arrest and, in addition to its original opinion, stated that the police were therefore subject to no criticism. Other cases have indirectly made the same point.

July 6 and taken to the hospital. Under these circumstances, we believe the police procedure of submitting photographs was reasonable and proper. See People v. Williams, 104 Ill App2d 329, 334, 244 NE2d 347.

■ Defendant also contends that because Mrs. Dunlap and her son examined the photographs together, the identification was so inherently suggestive as to deny him a fair trial. We find no merit in this contention because of the independent and positive nature of the identification by Mrs. Dunlap. She was face to face with the burglar for a full five minutes while she questioned him about his possession of her neighbor's television; this certainly afforded her an excellent view of the burglar and a solid, independent origin for her later identifications of defendant. Further, she was the first to look at the photographs and thus it cannot be argued that she was affected by anyone else's identification of defendant's picture.

Defendant finally argues that he was not proven guilty beyond a reasonable doubt because of three circumstances: (1) the testimony of Samuel Dunlap was weak and uncertain; (2) the in-court identification by Mrs. Dunlap was tainted; and (3) the defendant presented an uncontroverted alibi defense.

First, the testimony of Samuel Dunlap is not weak and uncertain. When asked, after having identified defendant in court:

> Q. Are you positive the man you identified here in court is the man which you saw in front of your house with the television set on June 30, 1966?

the witness answered, "Yes, sir." There is no evidence which would intimate that he was affected by his mother's selection of defendant's picture.

Second, we fail to find any taint of Mrs. Dunlap's in-court identification. Her selection of defendant's picture

407

was not, as we have explained previously, affected in any way by the presence of her son; and she had an excellent opportunity to observe the defendant in what, obviously, seemed to her to be suspicious circumstances. As stated in People v. Brinkley, 33 Ill2d 403, 405, 211 NE2d 730:

> Where the identification of an accused is at issue in a criminal case, we have constantly reiterated the rule that the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made.

■ Third, the credibility and weight to be given the testimony of defendant's alibi witnesses is a matter for the trial court whose determination will not be disturbed unless palpably erroneous. People v. Ostrand, 35 Ill2d 520, 532–533, 221 NE2d 499.

■ In the instant case where Mrs. Dunlap, a schoolteacher, had an excellent view of the accused in broad daylight, and where there is conflict in some of the alibi testimony, we find no reason for disturbing the judgment, and the judgment is affirmed.

Affirmed.

ENGLISH and McNAMARA, JJ., concur.