THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR JACK ROBERTS, Defendant-Appellant.

First District (3rd Division) No. 60273

Opinion filed March 4, 1976.

Dean S. Wolfson and Sherman C. Magidson, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and William J. Haddad, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Following a finding of no probable cause at a preliminary hearing, defendant, Arthur Jack Roberts, was indicted and tried for the murder of Edward Willis. After a bench trial in the circuit court of Cook County, defendant was found guilty of the lesser-included offense of involuntary manslaughter and was sentenced to one to ten years. Defendant contends on appeal that he was not proved guilty beyond a reasonable doubt, and that the trial court erred in the admission of certain rebuttal evidence.

At approximately 1:15 a.m. on March 24, 1973, Edward Willis was

found mortally wounded in an alley behind the Tiffin Theatre in the City of Chicago.

At about 10:30 p.m. on March 23, Willis, his girl friend Debra Peters, and several friends went to Hank's Tap, located on West North Avenue in Chicago. Willis' friends were members of the Rebels, a motorcycle club; Willis was a prospective member. Approximately one hour later, defendant and his brother Larry entered the tavern, which was owned by defendant's father-in-law. Defendant stood talking to friends near the bar stools occupied by Willis and Debra. According to Debra, when defendant started to lean backwards toward them, Willis reached out and either stopped or pushed him away. The two men exchanged words and then had a brief fist fight. Willis sustained no damage and defendant's face was bruised. After the two men were separated, Debra observed defendant run around the bar and then to a telephone. At this point Willis and she left the tavern.

Thomas Ryza, who had accompanied Willis into the tavern, testified that after the fight was broken up defendant ran behind the bar and told the bartender to give him a gun or a club. After the bartender refused and pushed him away, defendant made a telephone call, during which he stated that he had "got in it with the Rebels" and that he wanted his gun. Defendant then ran out of the tavern, followed by Ryza.

Ryza testified that outside of the tavern defendant approached the car in which Willis and Debra were sitting and stated that he would kill Willis if the latter ever returned to North Avenue. Defendant then ran to a friend's car parked nearby and demanded a gun. As defendant started to reach under the front seat, he was restrained by others, and the car in which Willis was riding pulled away.

On cross-examination Ryza stated that on the evening in question he did not see a gun in the possession of defendant or Willis. Ryza did not relate the above series of events to the police until after the defendant was subsequently discharged at a preliminary hearing. He thought that enough people had informed the authorities what had occurred at the tavern.

Robert Bakalik, another friend of Willis who accompanied him to the tavern, also testified for the State and corroborated the testimony of Ryza as to what occurred inside the tavern and to the subsequent events outside the tavern. Bakalik further testified that he told Willis and Debra that everyone was going to Britt Baker's house after leaving the tavern. He stated that Debra and Willis left Baker's house sometime between 12:30 a.m. and 1 a.m. and that Debra returned alone 15 minutes later.

On cross-examination Bakalik testified that he did not inform the police of the threats he heard defendant make because he was not asked.

He did not mention the matter to the authorities until six or eight months had elapsed.

Debra Peters testified that their group went from the tavern to Britt Baker's home, located at North Avenue and Keystone in Chicago. She stated that defendant and his brother were nearby when Bakalik told the group to go to Baker's home. After a short time Willis and she walked to a nearby liquor store to make a purchase. While returning to the Baker residence, the couple were walking through an alley behind the Tiffin Theatre when a dark, four-door auto drove up behind them. Willis pushed Debra and told her to run. The vehicle passed the couple, backed up, and three men holding pistols emerged. As Willis ran forward, he was caught by the two passengers. The driver then grabbed Willis. Debra was standing at the rear of the car on the driver's side. The car's exterior and inner lights were on, and Debra's view was clear and unobstructed. The driver and Willis were facing each other on either side of one of the lighted headlights, and Debra saw the driver holding a gun near Willis' face. One of the passengers wearing a green jacket with oval name patches on the chest pockets grabbed Debra and told her to run. She was held for about a minute. After a shot rang out, Debra ran forward past the three men and the mortally wounded Willis. Upon her arrival at Baker's home, the police were called, and she told them that "Jack," the defendant, had done the shooting.

On cross-examination Debra estimated that the police arrived at the scene of the shooting at 1 a.m. She was uncertain, but she believed the man who grabbed her in the alley was defendant's brother Larry. At the first lineup she viewed in the early morning hours of March 24, she observed five men. She immediately recognized defendant as the man who had shot Willis but she did not verbally identify him. She was about to inform Officer Fitzgibbons of her recognition when the officer abruptly ended the lineup and told her not to say anything because he wanted a new lineup with an additional male. Debra expressly identified defendant as the killer during subsequent lineups that morning.

Officer Richard DeVitto of the Chicago Police Department testified for the State that he arrived at the scene of the shooting shortly before 1:15 a.m. The body was lying on the north side of the alley behind the theatre. The body was across from the fire exit doors of the theatre approximately 20 yards east of the Karlov Avenue entrance to the alley. The officer recalled that the lighting conditions were good. He did not recall whether the fire exit lights were burning at the time. DeVitto estimated that the street lights were 20 to 30 yards away from the body. He could see so clearly that he did not have to use his flashlight.

Sergeant Roger Sullivan of the Chicago Police Department testified

for the State that after defendant arrived at the police station Sullivan escorted him upstairs to a lineup. As they were walking, he asked defendant what happened. Defendant replied that he had meant only to hit Willis over the head, not to shoot him. Sullivan testified that he related that statement to Fitzgibbons, the investigating police officer. Sullivan did not recall telling anyone else about the statement until after defendant was discharged at the preliminary hearing. Sullivan did not make a written report concerning defendant's statement. After defendant's release, Sullivan was contacted by Investigator Law and Willis' mother, who both inquired about the statement defendant had made.

Defendant testified in his own behalf and offered an alibi defense. He was presently managing the J & J Lounge, located at 2128 West North Hoyne in Chicago from 6:30 p.m. to 11:30 p.m. on March 23. At the bar, owned by his mother, he had several drinks. At 11:30 p.m., defendant, his brother Larry, and Howard Baker, an acquaintance, left in two cars for Hank's Tavern. Baker parked his car immediately in front of the one in which Willis had been driven. Defendant admitted that at Hank's he had a brief scuffle with Willis, after which he asked for a weapon. A few minutes later he left the tavern and had an argument with Willis outside. According to defendant, that was the last time he saw Willis.

Defendant stated that thereafter his brother and he went to another tavern frequented by Paul Baker, president of the Rebels, to ask him to calm things down. Not finding him the brothers returned to their mother's tavern, arriving at about 12:40 a.m. Howard Baker and Luther Farmer, a part-time bartender, were there when they arrived. Walter "Sonny" Ziemblicki, at the time a Chicago police officer, arrived at the lounge a few minutes before 1 a.m. Defendant closed the bar at 1:30 a.m. and went out to breakfast with his mother, brother and Farmer. They left the restaurant at 2:30 a.m., and upon arriving home defendant was arrested. No weapon was found on him or in his car.

Upon being taken to the police station defendant was asked if he had shot Willis and he answered that he had not. Defendant denied being escorted to a lineup by Sergeant Sullivan and denied having made an admission to him. His only discussion with Sullivan was when Sullivan attempted to get him to sign a confession, which he refused to do.

On cross-examination defendant stated that he was "highly intoxicated" for most of the evening, but he claimed that his intoxication did not affect his actions or awareness. He was angry after the fight with Willis. Although defendant stated on direct examination that he knew what time he had returned to his mother's lounge because he looked at the clock, he admitted on cross-examination that at the preliminary hearing he testified he did not watch the clocks in the lounge on his

arrival. Defendant also contradicted his direct testimony by admitting that at the preliminary hearing he had testified that "Sonny" Ziemblicki was already at the lounge when he returned. Defendant was aware that the Rebels congregated occasionally on Friday nights at Britt Baker's house.

Officer John Rice testified for the defense that he arrested defendant. He asked defendant soon after his arrest if he had killed Willis, and that defendant denied any involvement.

Officer James Fitzgibbons testified for the defense that he was the investigator assigned to this case. He denied that Sergeant Sullivan had ever related to him defendant's admission of involvement in Willis' death. Fitzgibbons handled the several lineups. He summarily terminated the first lineup because he wanted to add Larry Roberts to it and because Debra Peters felt weak. As he escorted her from the first lineup, he asked Debra if any person in the lineup had done the killing. She replied that she was confused and that her "husband" had just been killed. Soon thereafter Debra picked out defendant as the killer in subsequent lineups. At the time of trial Fitzgibbons was a patrolman rather than an investigator for the Chicago Police Department.

Officer George Ruckrich testified that Sullivan had not related defendant's admission to him. Ruckrich was Fitzgibbons' superior at the time of defendant's arrest and in charge of the investigation of the death of Willis.

Howard Baker, a long-time friend of Luther Farmer and an acquaintance of defendant's, testified for the defense and corroborated the time which defendant left and returned to the lounge. He stated that defendant and his brother returned about ten minutes after the witness did and that he remained with them until 1:30 a.m. He also testified that Ziemblicki arrived at 12:45 a.m. On cross-examination, the witness conceded that he was in a "high" condition that evening because of the amount of liquor he drank.

Walter "Sonny" Ziemblicki was a Chicago police officer with seven years' experience at the time of the killing. At the time of trial he had resigned from the force. He testified that on the evening in question he got off work at 12:30 a.m., went home to change, arrived at the J & J Lounge at about 1 a.m., and left at 1:30 a.m. He saw defendant there.

On cross-examination, Ziemblicki stated that the first time he had told anyone he was with defendant during that time period was to defendant's wife several days after the shooting. He never told any of his superiors that he was a defense alibi witness and never reduced his alibi information to writing. A few days after the killing Ziemblicki ob-

tained a copy of the police report on this case. He destroyed the report after reading it. He was curious as to what it contained.

Larry Roberts, defendant's brother, substantially corroborated defendant's alibi. He also testified that in Hank's he wore work clothes, including a green shirt which had an oval name tag on the right side of the chest.

John Clark, owner and operator of the Tiffin Theatre, testified from his business records that the last feature of his theatre on March 23 concluded at 11:38 p.m. Under normal operating procedures, the external lights to the theatre are extinguished 20 minutes after closing. He did not personally close up on the evening in question.

In rebuttal Officer Constantine Belles of the mobile unit of the crime laboratory identified two photographs as taken of the area behind the theatre at approximately 9 p.m. on September 9, 1973, when, he said, the lighting conditions in the alley were about the same as when he took photographs on March 24 at 1 a.m. The more recent set of photographs were taken without flashbulbs and using the low beam headlights of a squad car. It was dark in the alley on both occasions.

Paul Baker, president of the Rebels, testified in rebuttal without objection that on March 24, 1973, the defendant's brother Larry telephoned him and said he was sorry about what happened; that defendant and he were on their way to see him the night before; that defendant had killed Willis accidentally; and that he wanted no more trouble. Baker said all right but to stay away from him and his club. The brother replied that if defendant had not been drunk the shooting would not have occurred. Defendant's brother also admitted being the one who grabbed Debra in the alley that evening.

On cross-examination, Baker stated that he did not inform the police of this conversation until Investigator Law spoke to him after defendant had been discharged at a preliminary hearing. He did not believe it important enough to inform the police, but he did tell the parents of Willis about it.

Officer Joseph DeFranco testified in rebuttal that Sergeant Sullivan did escort defendant up some stairs in the police station after defendant's arrest.

Defendant's primary contention is that he was not proved guilty of involuntary manslaughter beyond a reasonable doubt. He initially argues that the evidence adduced by the State would only support a conviction for murder, and defendant's acquittal of that charge mandates the reversal of his conviction for the lesser-included offense of involuntary manslaughter.

██ A prosecution for the crime of murder which results in a conviction for a lesser-included offense constitutes an implied acquittal for the greater crime of murder. (*People v. Thompson* (1973), 11 Ill. App. 3d 752, 297 N.E.2d 592.) To be sustained, the conviction for the lesser-included offense must be shown to have been based upon some evidence in the record which establishes the necessary elements of that offense. (*People v. Barksdale* (1970), 131 Ill. App. 2d 103, 266 N.E.2d 516.) It is the duty of the trier of fact to choose between differing legal concepts offered at trial (*People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497), and his decision will not be disturbed unless shown to be palpably erroneous. *People v. Taylor* (1973), 54 Ill. 2d 558, 301 N.E.2d 273; *People v. Wiggins* (1957), 12 Ill. 2d 418, 147 N.E.2d 80.

██ One is guilty of involuntary manslaughter in Illinois when he kills another without lawful justification where his acts which cause the death are such as are likely to cause death or great bodily harm to another and are done recklessly. (Ill. Rev. Stat. 1973, ch. 38, par. 9—3(a).) One is reckless when he consciously disregards a substantial and unjustifiable risk, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. See Ill. Rev. Stat. 1973, ch. 38, par. 4—6.

Defendant argues that the evidence presented at trial portrays a deliberate assassination committed by him permitting a conviction only of murder. While we heartily agree with defendant that the evidence adduced could have supported a conviction for murder, we also believe that there is sufficient evidence in the record to support the involuntary manslaughter conviction. Defendant was highly intoxicated on the evening in question. Debra Peters, the sole eyewitness to the killing, testified that she saw defendant holding the gun "by" Willis' head as the two men faced each other. After a shot was fired, Debra was able to run unchallenged past the three assailants. Significantly, soon after the killing, defendant told a police sergeant that he only meant to strike the defendant over the head and not to shoot him. We are of the opinion that the trier of fact was entitled to believe defendant unintentionally shot Willis and consequently hold him guilty of involuntary manslaughter.

██ There is ample authority holding that the unintentional discharge of a loaded gun pointed in the direction of another at close quarters resulting in that person's death constitutes a conscious disregard of a substantial and unjustifiable risk in gross deviation of the reasonable man standard. (*People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100; *People v. Tarpley* (1972), 8 Ill. App. 3d 960, 291 N.E.2d 262; also see *People v. Rodgers* (1971), 2 Ill. App. 3d 507, 276 N.E.2d 504; *People*

*v. Thomas* (1971), 1 Ill. App. 3d 139, 275 N.E.2d 253.) The act becomes even more reckless when the one pointing the loaded gun is under the influence of intoxicating liquor. (*People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.) The evidence was sufficient to support a conviction for involuntary manslaughter.

Under defendant's reasonable doubt argument, defendant maintains that the State's evidence details a pistol-whipping of Willis prior to the shooting; that such conduct amounted to aggravated battery; and that since involuntary manslaughter is not a lesser-included offense of aggravated battery, defendant's conviction must be reversed.

Defendant's premise is factually deficient. Debra Peters gave no testimony that Willis was pistol-whipped at any time in the alley. Defendant's statement to Sergeant Sullivan was that he had *meant* to strike defendant and not shoot him. There was no testimony that defendant had pistol-whipped Willis. Defendant's position has no validity.

■■ Defendant continues his reasonable doubt argument by asserting that the State's proof was not clear and convincing. While it is true that defendant offered defense of alibi supported by others, the trier of fact was not bound to accept it in the face of credible testimony by the State. (*People v. Lowe* (1969), 112 Ill. App. 2d 399, 251 N.E.2d 329.) The exact time of the shooting was not pinpointed at trial, and the scene of the shooting was not a great distance away from the place where defendant claimed to be at the time of the killing. Moreover, the record demonstrates conflicting statements made by both defendant and his alibi witnesses regarding the crucial times the various people returned to the lounge in the early morning of March 24. Finally, defendant was identified by Debra Peters as having done the shooting.

■■ Defendant challenges Debra's identification as not being clear and spontaneous. He strikes upon her lack of spontaneity in not informing Officer Fitzgibbons at the first lineup that defendant had shot Willis. Even ignoring the explanation given by Debra at trial on this point, we find the identification positive and convincing. During the confrontation in the alley, she stood approximately one car length away from defendant. She testified that defendant stood facing Willis on either side of one of the auto's lighted headlights. Nothing obstructed her vision. She had seen the defendant a short time before this episode. After the shooting, she immediately told the police that defendant had done the shooting. She identified defendant at two or three lineups within hours after the killing and also in court.

Defendant also challenges the credibility of Sergeant Sullivan's significant account of the statement made by defendant. Vigorous cross-examination of Sullivan did not shake his testimony. Defendant's testi-

mony that Sullivan did not escort him up the stairs to a lineup was rebutted by Officer DeFranco. The trial judge was in a superior position to determine Sullivan's truthfulness, and he specifically stated that he found Sullivan's testimony to be credible. The evidence was sufficient to support defendant's conviction for involuntary manslaughter.

Defendant's next contention is that the trial court committed reversible error in the admission and consideration of prejudicial hearsay rebuttal testimony under the guise of impeachment. Defendant's brother testified during direct examination that he was with defendant in a tavern at the time of the killing. During cross-examination, the witness admitted telephoning Paul Baker, the rebuttal witness, but specifically denied stating that defendant had shot Willis. On rebuttal, Paul Baker testified that defendant's brother, in their telephone conversation of March 24, stated that defendant had unintentionally shot Willis and that he had been at the scene of the shooting with defendant.

■■■ Defendant is precluded from raising this issue on review since he neither objected to the testimony at trial nor included it in his post-trial motion. Nevertheless, even if the issue were preserved for consideration, no error was committed. The State may directly contradict a defense witness' alibi testimony with that witness' prior inconsistent oral statement. (*People v. Tate* (1964), 30 Ill. 2d 400, 197 N.E.2d 26.) Error occurs when the hearsay evidence is used not to cast doubt on the witness' credibility but to bear directly on the question of defendant's guilt. (*People v. Montgomery* (1972), 51 Ill. 2d 198, 282 N.E.2d 138; *People v. McKee* (1968), 39 Ill. 2d 265, 235 N.E.2d 625.) A reading of the record convinces us that the State did not do indirectly what it could not do directly. The examination of the rebuttal witness was brief and to the point. Collateral issues were not explored and it was a trial without a jury. The judge, as trier of fact, is presumptively deemed to consider proper evidence only. The record does not support defendant's contention that the presumption was rebutted. Compare *People v. McKee*.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DEMPSEY and McGLOON, JJ., concur.