THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS MISCHKE *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—93—1425, 1—93—1426, 1—93—1609 cons.

———

Opinion filed December 27, 1995.—Rehearing denied March 8, 1996.

Stephen J. Connolly, of Clarendon Hills, for appellants Noe Torres and Anthony Serenas.

Hubert Hermanek, Jr., of Hubert E. Hermanek & Associates, and John M. Kalnins, both of Chicago, for appellant Thomas Mischke.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a bench trial, defendants, Thomas Mischke, Anthony Serenas, and Noe Torres, were found guilty of first-degree murder (720 ILCS 5/9—1(a)(2) (West 1992)). Serenas and Torres were convicted based on the accountability theory. Mischke was sentenced to 28 years' imprisonment, Serenas to 24 years' imprisonment, and Torres to 20 years' imprisonment. The three cases were consolidated on appeal.

Defendants assert that (1) the State failed to prove that they had the requisite intent for first-degree murder; (2) the trial court erroneously applied felony murder rules under the guise of misdemeanor murder; (3) the trial court erroneously applied the doctrine of transferred intent; (4) the trial court erroneously deprived them of the defense of accident or misadventure; (5) the trial court erroneously excluded state of mind evidence; (6) Mischke's conviction should be reduced to second-degree murder; and (7) the sentences should be reduced. In addition, defendants Serenas and Torres assert that the trial court (1) erred in applying the common design rule in finding them accountable for first-degree murder; (2) denied them the right to confrontation and due process by making inconsistent and erroneous rulings on severance and the admission of evidence; and (3) erroneously allowed them to be cross-examined regarding their failure to make certain statements to the police.

On December 29, 1991, at 2 a.m., there was a traffic altercation between the occupants of Mischke's black Mustang and Frank Dobson's automobile. Following the altercation, Mischke chased Dobson's vehicle, but lost sight of it. Mischke was driving, Serenas was in the front passenger seat, and Torres was in the back seat. Dobson returned to the apartment complex where Shannon Beckefeld lived, which was at 4064 W. 115th Street in Chicago, while Mischke continued to look for Dobson's vehicle.

Eventually, defendants found Dobson's vehicle at the apartment complex, where another altercation occurred between defendants and Dobson and Beckefeld. It ended after Beckefeld hit Serenas with a rock and Mischke sped away.

At trial, Dobson testified that he ran inside to get help when defendants returned 10 minutes later. When he came back outside, defendants were on top of Beckefeld, beating her. After Dobson yelled for them to get off, Mischke pointed a black .22-caliber gun at Dobson's face. Mischke told Dobson to get on his knees, but Dobson

refused. Instead, he backed up towards the apartment building and yelled that Mischke had a gun. Serenas had a pipe in his hand and Torres had a small club.

At that point, Robert Burke and John Dean, who had not been involved in the previous altercations, came out of the building. Beckefeld was still lying on the ground. Mischke pulled the trigger twice as he continued to point the gun at Dobson. Both times, the gun clicked but did not fire. Then, Mischke backed away toward the parking lot. Dobson did not hear anyone yell that the police were coming. As all three defendants ran toward the parking lot, he ran after them with a table leg in his hand.

Dobson saw the victim, Anthony Sciortino, come from between two parked cars. Mischke, still backing up, ran past Sciortino, who turned around and faced Mischke. He had nothing in his hands and was standing still. Dobson did not hear Sciortino say anything to Mischke. Nevertheless, Mischke turned and fired the gun twice at Sciortino. The first time, the gun clicked, but the second time it fired. Mischke fled and Sciortino walked 25 feet, then dropped to the ground. At the time of the shooting, Serenas and Torres were in the parking lot 30 feet away.

Beckefeld testified that defendants confronted her in front of her apartment building when they returned after the second altercation. Mischke pointed a gun at her and said, "Turn around Bitch." He pulled the trigger, which clicked, then ordered her to walk up the hill while he held the gun in her back.

As they went up the hill, they were flanked by Serenas, who had a pipe, and Torres, who had something shiny in his hand. Dobson came out of the building just as Mischke kicked Beckefeld and knocked Beckefeld to the ground. Serenas beat her on the back with the pipe and Torres kicked her. After the beating, Beckefeld stayed on the ground because she was scared. As a result, she could hear, but not see, what was happening.

She heard Mischke order Dobson onto his knees, then heard someone yell from the building that the cops were coming. Defendants ran and Beckefeld heard Mischke yell to Sciortino to get on the ground and that he was going to blow his brains out.

John Dean testified that he and Robert Burke were in Beckefeld's apartment when Dobson and Beckefeld came into the apartment and left again. Dean and Burke followed them outside, where Dean saw Beckefeld on the grass a short distance from the building's entrance. Torres knocked Beckefeld down and kicked her two or three times while Mischke pointed a gun at Dobson. He pulled the trigger, but the gun did not fire. As Mischke flaunted the gun, waving it around,

Serenas came over to talk to Dean and Burke. There was a lot of commotion and everyone was pushing and shoving each other. Dean did not hear anyone yell that the police had been called.

When Mischke was backing away toward the parking lot, Dean did not see Serenas and Torres. Sciortino walked past Mischke, then stopped and turned around. Mischke pointed the gun at Sciortino, who put up both hands. Even though Sciortino did not threaten Mischke, Mischke pulled the trigger three times. The third time, the gun went off and Sciortino was shot.

Robert Burke's testimony was similar to Dean's. In addition, he stated that Sciortino yelled to Mischke, "Don't ever point a gun at me," before Mischke pulled the trigger three times. Although Sciortino never ran up to Mischke, he chased Mischke after he was shot, but fell.

Laura Bisecky, who was Sciortino's girlfriend, testified that Sciortino was opening a window in her apartment when he saw some people getting out of a car in the parking lot. Because Bisecky's car had been vandalized the previous week, Sciortino was afraid that it was going to be damaged again; so, he left to check on her car. Bisecky watched him from her window until she lost sight of him after he ran behind the building next door. Bisecky heard unfamiliar voices, then a pop, then saw three people running toward a black car in the parking lot. She went outside and found Sciortino lying in the parking lot.

There was a stipulation that Dr. Kirschner, who performed the autopsy, would testify that Sciortino was killed by one gunshot to the chest.

Following the denial of defendants' motions for a directed finding, Torres testified that he, Mischke, and Serenas were riding around in Mischke's black Mustang on the evening of December 28, 1991. Following the two altercations with Dobson and Beckefeld, Mischke drove to his house, which was nearby. Torres and Serenas stayed in the car while he went inside. After less than a minute, Mischke returned carrying a gun, a bat, and a knife. He gave the bat to Serenas and the knife to Torres, who took it so that he could defend himself if threatened. Mischke looked through the gun's bullet holes. He said that the gun was not loaded and that he was only going to scare Dobson and Beckefeld. Even so, Torres told Mischke not to fire the gun.

When defendants arrived at the apartment complex, they got out of the car. Torres had the knife in his back pocket, but never took it out. As they reached Beckefeld's building, she started screaming. Mischke pointed the gun at her and pulled the trigger, but the gun

did not fire. Beckefeld screamed, "He's got a gun," and ran toward the building. Torres denied that either he or Serenas ever hit Beckefeld. Torres did not see Mischke point the gun at Dobson, who had a stick in his hand.

When Torres heard someone yell that the police were coming, he ran towards the car, which was one building away. Torres ran past Sciortino, who was coming from between two cars. When Torres reached the car, he turned and saw Serenas running toward the car and Mischke walking backwards. Sciortino turned around and faced Mischke, then began walking toward him. After Torres heard a gunshot, Mischke ran to the car.

Defendants left the apartment complex and went to Mischke's cousin's house. There, Mischke put the gun, bat, and knife under his cousin's bed and left his car in the garage.

Torres stated that he had given the gun to Mischke two months earlier. He did not know whether it was loaded at that time, but thought it was unloaded on December 29, 1991. Torres did not remember if he told the police that he thought the gun was unloaded, but did tell them that he told Mischke not to fire it. Torres admitted that he never tried to get Mischke or Serenas to leave the scene.

Serenas' testimony was consistent with Torres'. He also stated that he did not intend using the pipe, but wanted only to scare Beckefeld. Serenas saw Mischke point the gun at Dobson and pull the trigger twice, but heard only clicks. When Serenas heard someone yell that the police were coming, he went to the car. He did not see Sciortino or the shooting, but heard the gunshot. At the time of the shooting, Torres was next to the car and Serenas was going toward the car. Following the shooting, Sciortino chased Mischke, who was running to the car.

At the time of the shooting, Serenas believed that the gun was not loaded because Mischke had told him so. Nevertheless, Serenas never told the police that he thought the gun was unloaded. He admitted that he never asked Mischke to leave or to stop waving the gun around.

After Torres and Serenas rested their cases, Mischke testified that he had no prior experience with firearms. When Torres gave him the gun two months earlier, he put it in the ceiling rafter of his basement and did not touch it until the night of the shooting.

Much of Mischke's testimony about the incident was consistent with that of Torres and Serenas. In addition, he testified that he got the gun because he was afraid of being beaten and wanted to scare Dobson and Beckefeld. He looked into four of the gun's holes to see if there were any bullets in them. When he did not see any, he believed

that the gun was not loaded. When he got into the car, Mischke told Torres and Serenas that the gun was not loaded and again looked into the bullet holes.

Mischke admitted that he immediately confronted Beckefeld with the gun when he returned to the apartment complex. Although he pointed the gun at her and pulled the trigger, he denied sticking it in her back and making her walk up a hill. Mischke also admitted pointing the gun at Dobson and pulling the trigger twice, but denied ordering him onto the ground.

According to Mischke, he ran when he heard someone yell that the police were coming. Sciortino ran past him, but stopped, turned around, and began following him. Mischke contended that Sciortino was angry and excited. When Sciortino asked him why he had a gun, Mischke told him to stay back and to get away from him. Mischke claimed that he pulled the trigger to scare Sciortino, who told Mischke to never point a gun at him. As Mischke pulled the trigger three times, Sciortino kept coming toward him from less than 10 feet away. Mischke stated that he was afraid of Sciortino even though he was unarmed. Mischke maintained that he did not think the gun would go off and his only intention was to scare Sciortino.

After the shooting, Mischke went to his cousin's house, where he opened the gun to see why it had fired. He found a shell casing, which he threw away. Mischke hid his new Mustang in his cousin's garage so that Dobson and Beckefeld would not see it on the street and damage it. Shortly after the shooting, he traded it in for a Cavalier.

Mischke further testified that he did not go to the police because he was scared. When he did speak to the police, he told them that he thought the gun was unloaded, but could not remember to which police officer he spoke.

In rebuttal, Chicago police detective William Higgins testified that he interviewed Torres for 15 to 20 minutes on January 28, 1992. According to Higgins, Torres said that he asked Mischke not to fire the gun, but never mentioned that he thought the gun was not loaded.

Chicago police sergeant Richard Kobel testified that he interviewed Mischke, who did not say that he thought the gun was unloaded or that he looked into the gun to determine whether or not it was loaded. In surrebuttal, Mischke testified that he told an officer other than Kobel that he believed that the gun was not loaded. He stated that the other police officer was wearing plain clothes and had dark hair. In sur-surrebuttal, Detective Karl testified that Mischke never told him that he believed that the gun was unloaded. Detective Pessavento was also present during the interview.

Following arguments, the trial court found all three defendants guilty of first-degree murder. There was a specific finding that defendants knew that the gun was loaded. Mischke was then sentenced to 28 years' imprisonment; Serenas to 24 years' imprisonment; and Torres to 20 years' imprisonment.

Defendants' main argument, which is based on the contention that they thought the gun was unloaded, is that they were not proven guilty of first-degree murder beyond a reasonable doubt. Assuming that he thought the gun was not loaded, Mischke argues that the State did not prove that he had the requisite intent for first-degree murder. To support that contention, Mischke asserts that his testimony was circumstantially corroborated in that after five clicks of the trigger, no bullets fired. Furthermore, there was no evidence presented from a gun expert that the gun misfired or was defective in any way. Prior to this incident, Mischke had never handled a gun except when Torres gave him the gun two months before the shooting. He placed the gun in the ceiling rafters of his basement and did not handle it again until he took it out on December 29, 1991.

The cases Mischke cites regarding involuntary manslaughter are inapplicable because they involve either involuntary manslaughter convictions where the reviewing court found there was sufficient evidence to support the conviction (*People v. Fernetti* (1983), 117 Ill. App. 3d 44, 46, 452 N.E.2d 790, *rev'd on other grounds* (1984), 104 Ill. 2d 19, 470 N.E.2d 501; *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 994, 382 N.E.2d 59; *People v. Chew* (1977), 45 Ill. App. 3d 1024, 1028, 360 N.E.2d 417) or sufficient evidence to instruct the jury on involuntary manslaughter (*People v. Bembroy* (1972), 4 Ill. App. 3d 522, 526, 281 N.E.2d 389); or where there was a trial court finding that the defendant unintentionally (*People v. Roberts* (1976), 36 Ill. App. 3d 811, 818, 345 N.E.2d 132) or accidentally (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 818, 438 N.E.2d 482; *People v. Farmer* (1977), 50 Ill. App. 3d 111, 114, 365 N.E.2d 177) shot the victim.

■ In this case, the gun did not fire accidentally because Mischke intentionally pulled the trigger each time. In addition, the trial court specifically found that defendants knew the gun was loaded. That finding, which was not against the manifest weight of the evidence, was based on the trial court's reasoning that Torres would not have told Mischke not to fire the gun if it were not loaded and none of the defendants told the police that they thought the gun was not loaded when they gave their statements. Where findings of fact must be determined from the credibility of the witnesses, a reviewing court will defer to those findings made by the court unless they are against the manifest weight of the evidence. *People v. Duplessis* (1993), 248 Ill. App. 3d 195, 200, 618 N.E.2d 1092.

Based on our affirmance of the trial court's finding that defendants knew that the gun was loaded, we conclude that the State proved the necessary mental state required for first-degree murder (720 ILCS 5/9—1(a)(2) (West 1992)), which is a killing that occurs when acts are performed with the knowledge that they create a strong probability of death or great bodily harm. No premeditated intent to kill Sciortino was necessary. It was sufficient to show that Mischke voluntarily and willfully pulled the trigger, the natural tendency of which was to destroy another's life (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59), knowing that it created a strong probability of death or great bodily harm to Sciortino. 720 ILCS 5/9—1(a)(2) (West 1992).

■ We reject Mischke's argument that his conviction should be reduced to second-degree murder (720 ILCS 5/9—2 (West 1992)) on the basis that Sciortino came onto the scene in an aggressive, combative, and belligerent manner. The only evidence that Mischke reasonably or unreasonably thought he had the right to use self-defense against Sciortino was his own testimony, which was contradicted by the other witnesses. The trial court heard the conflicting testimony and made a finding that is not against the manifest weight of the evidence. (*People v. Mullen* (1990), 141 Ill. 2d 394, 403, 566 N.E.2d 222; *People v. Tillman* (1991), 226 Ill. App. 3d 1, 13, 589 N.E.2d 587.) Furthermore, Mischke cannot claim self-defense because he was the aggressor in the situation that resulted in his encounter with Sciortino, which arose out of his own making. *Andersch*, 107 Ill. App. 3d at 819.

Serenas and Torres assert that they were not proven guilty beyond a reasonable doubt of first-degree murder on the basis of accountability. Their initial argument, that the trial court erroneously applied misdemeanor murder, is misplaced. All parties agree that there is no misdemeanor murder in Illinois. Defendants' confusion comes from *People v. Terry* (1984), 99 Ill. 2d 508, 515, 460 N.E.2d 746, in which the Illinois Supreme Court stated that the common-design rule imposes liability for murder even if a misdemeanor was originally intended. That did not create misdemeanor murder, but explained the common-design rule.

In a similar manner, defendants argue that the trial court erroneously used the transferred intent doctrine. Although the State mistakenly used the term "transferred intent" in pretrial comments to the trial court, during the motion for a directed finding, and during closing arguments, its argument was actually based on the common-design rule of the accountability theory. Transferred intent, which exists where a defendant shoots at one person and misses, but

kills an unintended victim (*People v. Marshall* (1947), 398 Ill. 256, 263, 75 N.E.2d 310; *People v. Homes* (1995), 274 Ill. App. 3d 612, 623, 654 N.E.2d 662), does not apply in this case.

Serrenas' and Torres' main argument is that Mischke's involvement with Sciortino was not part of any common design, but was a separate and distinct incident that occurred after Serenas and Torres had gone back to the car and were not involved. Moreover, they had never before seen Sciortino and bore no ill feelings towards him.

After considering all the surrounding circumstances, we hold that the trial court properly applied the common-design rule. For a conviction on the accountability theory, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime, and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. (*People v. Strickland* (1993), 254 Ill. App. 3d 798, 806, 627 N.E.2d 218; *People v. Carrizales* (1992), 240 Ill. App. 3d 893, 900, 608 N.E.2d 30; 720 ILCS 5/5—2 (West 1992).) To prove the intent to promote or facilitate a crime, the State must establish beyond a reasonable doubt that the defendant shared the criminal intent of the principal or was engaged in a common design. *People v. Stanciel* (1992), 153 Ill. 2d 218, 234-35, 606 N.E.2d 1201.

Defendants were involved in the common design to go armed to the apartment complex to commit aggravated assault or battery against Dobson, Beckefeld, and their friends. Before the common criminal design ended, Sciortino was shot and killed by Mischke while Serenas and Torres were still in the general area. Serenas and Torres did not have to actively participate in Sciortino's murder in order to be guilty under the accountability theory. (*People v. Taylor* (1995), 164 Ill. 2d 131, 140, 646 N.E.2d 567.) One may aid and abet without actively participating in the overt act. (*Taylor*, 164 Ill. 2d at 140.) Proof of a common design need not be expressly stated but may be drawn from the circumstances surrounding the commission of the act. (*People v. Reid* (1990), 136 Ill. 2d 27, 62, 554 N.E.2d 174; *In re J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961.) Evidence that a defendant voluntarily attached himself to a group bent on illegal activity with the knowledge of its design supports an inference that he shared the common purpose. (*People v. Perez* (1985), 108 Ill. 2d 70, 82-83, 483 N.E.2d 250.) Furthermore, proof that Serenas and Torres were present during the shooting, fled the scene, maintained a close affiliation with Mischke afterwards, and failed to report the crime are all factors that the trial court could consider in determining their legal accountability. *Reid*, 136 Ill. 2d at 62.

■ After reviewing the evidence in the light most favorable to the State, as we must (*People v. Williams* (1995), 165 Ill. 2d 51, 55, 649 N.E.2d 397), we find that there was sufficient evidence to find Serenas and Torres guilty of first-degree murder under an accountability theory. Serenas and Torres were involved in a common criminal design with Mischke when they armed themselves and went to the apartment complex. All three defendants were together from the beginning until the end. They never separated from each other, even after the shooting took place. When the traffic altercation took place, defendants went looking for Dobson. Another altercation took place at the apartment complex between defendants and Dobson and Beckefeld. Defendants acted together when they went to Mischke's home and armed themselves with a gun, a pipe, and a knife. Thus armed, defendants returned to the apartment complex where altercations took place (all three defendants struck Beckefeld) followed by the shooting. At the time of the shooting, they were all present. They never disassociated themselves from the common criminal design or tried to stop Mischke. Instead, they continued to act in concert after the shooting. Defendants fled the scene together and went to Mischke's cousin's home, where they hid their weapons and the car. After that occurred, defendants separated for the first time that evening. When they fled, they were still involved in the common design. (*People v. Kessler* (1974), 57 Ill. 2d 493, 494, 315 N.E.2d 29.) There was sufficient evidence to prove they shared the criminal intent of Mischke. (*Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201.) After Serenas was struck with a rock by Beckefeld, defendants armed themselves and returned to the scene with the intent to use their weapons. They were seeking revenge. In this case, the evidence to find defendants Torres and Serenas accountable for the death of Sciortino proved that they shared the criminal intent to promote or facilitate the shooting of Sciortino. *Stanciel*, 153 Ill. 2d at 234-35.

■ Next, Serenas and Torres raise several trial errors. First, they assert that the trial court erroneously excluded evidence of the states of mind of the victim and defendants. We reject those arguments because either the exclusion was proper, the evidence was entered through other testimony, or the exclusion was harmless error.

Serenas and Torres then argue that the trial court made inconsistent and erroneous rulings on their motion for severance, thus denying them the right to confrontation and due process.

The record indicates that the trial court did not grant a blanket severance motion, but stated that it was granting it if an out-of-court statement by Mischke were introduced and he did not testify, thus precluding any cross-examination. That never occurred. While it is

true that the trial court later made confusing remarks regarding the testimonies of the three defendants, the trial court never precluded cross-examination of Mischke by Serenas or Torres. Furthermore, the trial court is presumed to know the law, to apply it properly, and to consider only competent evidence. *People v. Harris* (1974), 57 Ill. 2d 228, 231, 314 N.E.2d 465; *People v. Stewart* (1989), 186 Ill. App. 3d 833, 840, 542 N.E.2d 915.

The trial court did not abuse its discretion in denying the motion to sever. A defendant does not have an automatic right in Illinois to be tried separately from his codefendants merely because they are indicted together for crimes arising from the same circumstances. (*People v. Bean* (1985), 109 Ill. 2d 80, 92, 485 N.E.2d 349.) The general rule is that defendants jointly indicted are to be tried together unless fairness to one of them requires a separate trial to avoid prejudice. (*Bean*, 109 Ill. 2d at 92; *People v. Bond* (1992), 230 Ill. App. 3d 1086, 1088, 598 N.E.2d 979.) Mere apprehensions of prejudice are not enough. (*Bean*, 109 Ill. 2d at 92.) There must be actual hostility between the codefendants. (*Bond*, 230 Ill. App. 3d at 1088.) The decision to grant severance is within the trial court's sound discretion and will not be reversed without an abuse of discretion. *Bean*, 109 Ill. 2d at 93; *People v. Murphy* (1981), 93 Ill. App. 3d 606, 609, 417 N.E.2d 759.

■ In this case, none of the defendants suffered prejudice from being tried together. There were no conflicting defenses that caused hostility among them. Thus, the trial court did not abuse its discretion in denying the severance motion.

Next, defendants assert that the trial court improperly allowed rebuttal evidence by Kobel and Karl as substantive evidence against all defendants on a collateral issue. Rebuttal evidence is presented by the State to explain, repel, contradict, or disprove evidence presented by the defendant. (*People v. Rios* (1986), 145 Ill. App. 3d 571, 584, 495 N.E.2d 1103.) It is allowed when it is relevant to the question of the defendant's believability and veracity. (*People v. Bush* (1981), 103 Ill. App. 3d 5, 14, 430 N.E.2d 514.) The decision whether to admit rebuttal testimony is within the trial court's sound discretion and will not be reversed absent a showing of abuse of discretion. *Rios*, 145 Ill. App. 3d at 584.

■ The rebuttal testimony was properly admitted to contradict Mischke's testimony regarding his statements to the police. Although Mischke testified that he told a police officer that he thought the gun was unloaded, Kobel and Karl testified that he made no such statement during his interrogation. That was proper rebuttal testimony on a material issue, not a collateral issue. It was important testimony

because it went to the crucial issue of Mischke's intent. Moreover, it is presumed that the trial court properly applied the law to the different testimonies and considered only competent evidence. *Harris*, 57 Ill. 2d at 231; *Stewart*, 186 Ill. App. 3d at 840.

Next, Serenas and Torres assert that the trial court erred when it allowed them to be cross-examined regarding their failure to make certain statements to the police. Specifically, they complain of the testimony that they did not tell the police that they thought the gun was unloaded.

■ There is no merit to this argument. While it is well established that a defendant's post-arrest silence cannot be used to impeach his trial testimony or to otherwise create an inference of guilt (*Doyle v. Ohio* (1976), 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245), *Doyle* does not apply to a cross-examination regarding actual prior inconsistent statements because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182; *People v. Frieberg* (1992), 147 Ill. 2d 326, 353-54, 589 N.E.2d 508.) Where a defendant does not remain completely silent after being advised of his *Miranda* rights, his failure to offer an exculpatory story to police may be used for impeachment if his post-arrest statements go beyond mere denial of knowledge and are manifestly inconsistent with his exculpatory trial testimony. (*Frieberg*, 147 Ill. 2d at 356; *People v. Huddleston* (1993), 243 Ill. App. 3d 1012, 1024-26, 614 N.E.2d 86.) Omitting facts within a statement does not involve the right to remain silent. *Frieberg*, 147 Ill. 2d at 356.

■ Finally, we affirm defendants' sentences. The trial court is best situated to tailor a sentence to the needs of the case by balancing the appropriate factors in imposing the sentence. (*People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473; *People v. Lopez* (1992), 228 Ill. App. 3d 1061, 1077, 593 N.E.2d 647.) There is a presumption that a trial court's sentencing decision is based on proper legal reasoning and that it considered all evidence in mitigation. (*People v. Hughes* (1994), 259 Ill. App. 3d 172, 179, 632 N.E.2d 251; *People v. Glass* (1992), 239 Ill. App. 3d 916, 931, 606 N.E.2d 655.) Since the sentence for first-degree murder is 20 to 60 years' imprisonment (730 ILCS 5/5—8—1(1)(a)(1) (West 1992)), the sentences imposed were within the statutory limits and there was no abuse of discretion. Thus, we

affirm the sentences. *People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708.

Affirmed.

GREIMAN, P.J., and TULLY, J., concur.