THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES CARLTON, Defendant-Appellant.

(No. 57610;

First District (3rd Division)—March 6, 1975.

G. Michael Cooper, Charles B. Evins, and R. Eugene Pincham, all of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Donald M. Devlin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant James Carlton was indicted for the murder of Randall Wilkins. He was convicted by a jury of involuntary manslaughter and was sentenced to 3 to 5 years' imprisonment. He contends that the homicide was accidental; an involuntary manslaughter instruction was not justified by the evidence; instructions for murder and involuntary manslaughter did not adequately apprise the jury of the law; the trial court erred in not granting his motion for a change of venue, in not granting him probation and by imposing an excessive sentence.

A tenant of a Chicago apartment building discovered the body of Randall Wilkins on the floor of an elevator about 7 P.M., May 7, 1971. She told her companion to hold the door and ran to her apartment and telephoned the police. When she came back she saw a hole in Wilkins' forehead which was surrounded by a grey area. She called the police again. Shortly before they arrived, she noticed a gun by a trash can near the elevator.

Two police officers responded to the calls. They found that Wilkins was still breathing, so a police vehicle was summoned and he was taken to a hospital. He died there that evening.

After talking to people at the apartment building, the officers went to the defendant's home. They arrested him, told him his rights and brought him to a police station. At the station he gave a statement to Theodore O'Connor, a homicide investigator. Carlton said that he and

two friends, Gregory Banks and Wilkins, entered the elevator about 7 P.M. Banks was carrying a .32-caliber revolver and gave it to Carlton. Carlton handled the gun and cocked it. The gun went off, shooting Wilkins in the forehead. Carlton said that he did not know if he pulled the trigger, "I must have but it just went off." Wilkins slumped to the floor. When the doors of the elevator opened, Carlton said that he and Banks got scared so they wiped the gun free of fingerprints, threw it behind a trash can and ran. O'Connor testified that when he took Carlton's statement, the defendant seemed upset, his eyes were watery and he appeared to be remorseful.

O'Connor had gone to the hospital earlier and had noticed powder around the wound in Wilkins' forehead. The powder indicated to O'Connor that a gun had been fired from about 1 to 1½ feet away from Wilkins' head. O'Connor asked Carlton how far away Wilkins had been when the gun fired, and Carlton answered about 4 feet. O'Connor did not include this question and answer in his police report nor in his testimony at the preliminary hearing.

Tests proved that the bullet lodged in Wilkins' head was fired from the gun found near the trash can. An expert from the firearms unit of the Chicago Police Department testified that he examined the gun and determined that 4 to 4½ pounds of pressure on the trigger was needed to fire it when the gun was cocked. Twelve and a half to thirteen pounds of pressure were needed when it was not cocked.

A pathologist testified that the bullet struck Wilkins in the forehead and deposited in the back of his head at the same horizontal level at which it entered the forehead. Had Wilkins' head been held in a vertical position, the path of the bullet would have been parallel to the ground. Two explanations follow from the description of the bullet's path: Wilkins was either looking down at the muzzle of the gun or the gun was raised to the level of his forehead when it was discharged. The pathologist testified that he could not determine from the path of the bullet the defendant's stance or his position relative to his companions when the gun was fired. Carlton told the police that he held the gun at waist level.

The defendant's mother was his only witness. She testified that James came home on the evening of May 7 and told her and her husband that he had accidentally shot Randall Wilkins. She said he was upset and crying. Her husband went to the scene of the shooting and James called the police. She stated that he told the police where Wilkins was and that he had shot him accidentally.

Section 9–3(a) of the Criminal Code states:
> "A person who kills an individual without lawful justification com-

mits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Ill. Rev. Stat. 1969, ch. 38, par. 9—3(a). Section 4—6 of the same code states:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1969, ch. 38, par. 4—6.

■■ Involuntary manslaughter is a lesser offense included in the crime of murder. An involuntary manslaughter instruction may be given in a murder case if the act of the defendant which caused death can reasonably be found to have been perilous to life and performed recklessly. (*People v. Bembroy* (1972), 4 Ill.App.3d 522, 281 N.E.2d 389.) Carlton was handed the gun as he entered the elevator. Wilkins was standing from 1 to 4 feet away from him. When the gun was discharged, it was pointed directly at Wilkins' head. Four to thirteen pounds of pressure had to be exerted on the trigger in order to fire the gun. From these facts (and the level course of the bullet through Wilkins' head and the powder marks around its point of entry) the jury could have found that the shooting was deliberate and the homicide murder; or it could have found that the shooting was unintentional, but that Carlton's handling of such a dangerous weapon in a small elevator was so reckless that it was a gross deviation from the standard of care which a reasonable person would exercise in a like situation. The court was correct in instructing the jury on involuntary manslaughter.

The defendant contends that the jury was bound to accept the story he told the police and his parents because it was neither improbable nor contradicted. He cites *People v. Jordan* (1954), 4 Ill.2d 155, 122 N.E.2d 209, where the defendant made a statement to the police and testified in court that the deceased ran after him swinging something like a billy club; the defendant punched him and the deceased fell and struck his head on cement causing injuries which resulted in death. In *Jordan* the defendant's statement and testimony provided the only evidence of what happened when the two men met. Testimony of other witnesses corroborated the defendant's story and no material part of the story was contradicted. The reviewing court held that because the defendant's story was not improbable and had not been contradicted the jury could not disregard it.

The facts in this case are not parallel to those in *Jordan*. Unlike *Jordan*, Carlton's version of the killing was contradicted by strong circumstantial evidence which pointed to his guilt. The trigger pull was so hard it was improbable that the gun could have accidentally fired; the powder burns proved that it was held close to Wilkin's head; wiping his fingerprints from the gun did not suggest innocence; doing nothing to help his fallen friend either by his own effort or by summoning medical assistance revealed a callous indifference not associated with an unfortunate mishap; fleeing from the scene indicated a consciousness of guilt. He may have felt remorse for his misdeed by the time he arrived home, but he showed none when he left Wilkins dying on the elevator floor.

■■ Since the State's evidence indicated that the killing was murder, it was Carlton's burden to prove circumstances justifying, mitigating or excusing his act. This he tried to do, not by testifying at his trial, but by what he had said to his parents and the police before the trial. In view of all the contradictory evidence, the jury was not bound to accept his self-serving story that the homicide was accidental.

The defendant next contends that the court's instructions did not adequately state the law concerning murder and involuntary manslaughter because the definitions of these offenses did not include the statutory words "without lawful justification." He argues that the excluded phrase was basic to his defense that the shooting was accidental. The jury was given Illinois Pattern Instructions 7.01 for murder and 7.07 for involuntary manslaughter. Rule 451(a) states that IPI-Criminal Instructions shall be used unless the court determines that they do not accurately state the law. Ill. Rev. Stat. 1969, ch. 110A, par. 451(a).

■■ The given instructions accurately stated the law. If the jury believed that the shooting was an accident, the elements of the crimes of murder and involuntary manslaughter as stated in those instructions could not have been proven. A material element of every offense is a voluntary act. (Ill. Rev. Stat. 1973, ch. 38, par. 4—1). An accident is not a voluntary act. An act that is committed accidentally does not involve a mental state cognizable to the criminal offenses of murder and involuntary manslaughter. The state of mind required for murder (other than in the commission of a forcible felony) is either the intention to kill or to do great bodily harm, or the knowledge that the act will cause death or create a strong probability of death. The state of mind required for involuntary manslaughter is recklessness—a conscious disregard of a substantial risk of causing either death or great bodily harm. The instructions adequately informed the jurors of the mental state necessary before the defendant could be found guilty of either offense. Informing

them that the offenses had to be "without legal justification" would have been superfluous. The omission of the phrase was not prejudicial to the defendant.

■■ The defendant complains that a motion he made for substitution of judges was improperly denied. This alleged mistake was not mentioned in his motion for a new trial. Any purported error not included in a written post-trial motion will not be considered on appeal. *People v. Landry* (1970), 123 Ill.App.2d 86, 259 N.E.2d 604.

■■ The defendant also complains that the trial court did not place him on probation and he requests that this court do so. A court of review does not have the authority to grant probation. (*People ex rel. Ward v. Moran* (1973), 54 Ill.2d 552, 301 N.E.2d 300.) There is no constitutional or statutory right to probation and whether to grant it or not is discretionary with the trial court. Carlton, an 18-year-old college student had never been arrested, but he was criminally responsible for the death of a companion of the same age. The trial court was neither arbitrary nor violative of its discretion in refusing probation.

However, the minimum sentence imposed upon the defendant is excessive and must be reduced to one-third of his maximum sentence which was fixed at 5 years. Unified Code of Corrections, section 5—8—1(c)(4).

The judgment of conviction is affirmed. The sentence is modified to 1 year 8 months to 5 years and, as modified, is affirmed.

Affirmed.

McNAMARA and MEJDA, JJ., concur.