THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DAVID MOCZARNEY, Defendant-Appellant.

First District (5th Division)    No. 77-238

Opinion filed October 20, 1978.

James J. Doherty, Public Defender, of Chicago (Vito A. Colucci and Suzanne M. Xinos, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Michael E. Shabat, and Michael L. Closen, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, David Moczarney, was charged by information with the offense of involuntary manslaughter in the shooting death of Noel Cordero. Following a bench trial, defendant was found guilty and sentenced to probation and work release. On appeal defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; and (2) he was denied due process of law because the trial court did not allow him the opportunity to make closing arguments or to argue his motion for new trial. We affirm. The pertinent facts follow.

There is little disagreement as to the facts surrounding Cordero's death. Early in the evening of July 1, 1976, defendant, Cordero and several other young people got together at an abandoned house on Schiller Street near Wicker Park on Chicago's near northwest side. In addition to defendant

and Cordero, the group included Anabil Felix, Linda Hernandez, Bratislav Lilic, Greg Szalaj and Steve Szalaj. The group was drinking and talking and defendant admitted to drinking both beer and hard liquor while he was there.

Defendant, Felix, Lilic and Steve Szalaj went to the back of the building where there was a second building on the lot. Defendant had a gun with him and Felix took the gun and fired it toward the building. Felix returned the gun to defendant and the four rejoined the rest of the group in front of the first building. There, defendant argued with Cordero. Both Lilic and Ms. Hernandez testified that defendant had threatened to kill Cordero, although Greg and Steve Szalaj testified that they merely heard defendant swearing and speaking loudly to Cordero, and Felix testified that he heard no argument at all. Cordero did not answer defendant.

Lilic testified that he then suggested that the group have a party at his home, and all seven persons left for his home in defendant's car. Lilic set up a table and chairs outside his apartment on the back porch landing. Lilic served some hard liquor to the group, which was drinking and talking on the porch. The group had arranged themselves around the small porch which measured approximately 4 feet by 9 or 10 feet. Cordero was seated on the top step of the landing and Ms. Hernandez sat on the stairway to the floor above. Felix first sat on a chair but then sat on the railing to make room for the table where the others sat.

While the group was on the porch, Lilic continued, defendant took the gun from his belt and handed it to Steve Szalaj, who removed the bullets and gave them to defendant. Defendant and Steve Szalaj then played Russian roulette with the empty gun. Lilic testified that both he and Ms. Hernandez told the two men to stop and Lilic asked for the gun. Defendant replaced the bullets and passed the gun to Steve Szalaj, who gave it to Lilic. Lilic hid the gun in his dining room and returned to the porch with a roulette game.

The group continued drinking and playing roulette and cards for a while before defendant and Steve Szalja decided to get a pizza around 9 p.m., Lilic testified. He, Ms. Hernandez and Steve Szalaj left the porch and went into the kitchen. Defendant stepped into the kitchen and asked Lilic to return his gun. Lilic hesitated, but then gave the gun to defendant, who was at the doorway leading to the porch. Lilic turned around to fix some drinks in the kitchen and heard a big bang. Thinking the noise was caused by a firecracker, Lilic headed for the porch to tell the group to stop playing around. When he stepped onto the porch, he saw Cordero slumped against the railing where he had been seated, saying he had been shot and was dying. Defendant had the gun in his hand and was saying Cordero would be all right. Defendant dropped the gun on the porch and

Lilic told him to "get rid of it." Defendant helped to carry Cordero downstairs.

Greg Szalaj testified that he saw his brother, Steve Szalaj, play Russian roulette with defendant and then saw defendant reload the gun before Steve Szalaj gave the gun to Lilic. At the time of the shooting Greg and Steve Szalaj and Ms. Hernandez were in Lilic's kitchen. Lilic entered the kitchen after defendant asked him to return the gun. Greg Szalaj saw Lilic give the gun to defendant but did not see defendant put the gun inside the belt to his trousers. He saw the defendant with the gun in one hand and the money for the pizza in the other. Greg Szalaj turned briefly towards the inside of the kitchen, then heard a shot followed by a scream. He ran out onto the porch and saw Cordero against the wall, bleeding from the chest. Steve Szalaj, Felix and defendant carried Cordero down the stairs.

Linda Hernandez testified that before defendant and Steve Szalaj played Russian roulette on Lilic's back porch, defendant had taken out the gun and was waving it around. Ms. Hernandez became frightened and upset and said something to the two men. They stopped playing with the gun, but she did not see who reloaded it. Ms. Hernandez was in the kitchen with Lilic and Steve and Greg Szalaj when defendant came to get his gun. She was talking to Steve Szalaj when she heard a shot and Cordero's voice and then saw Cordero fall, bleeding.

Anabil Felix testified that he had observed defendant and Steve Szalaj playing Russian roulette until Ms. Hernandez and Lilic told them to put the gun away. Lilic had then put the gun inside the apartment. Later, Felix was sitting next to Cordero near the wall when the others went into the apartment. Defendant came back out onto the porch with the gun in his right hand, waving it up and down. Felix heard some firecrackers and looked to his right. When he looked back, he saw Cordero falling. Defendant was standing right in front of Cordero, about 3 or 4 feet away. Felix did not see defendant trip or fall and heard nothing said by either defendant or Cordero before the shooting.

Steve Szalaj testified that he had had "quite a lot to drink" when he and defendant had played Russian roulette. Defendant had reloaded the gun before they gave it to Lilic. Steve Szalaj was in the kitchen when defendant asked Lilic to return the gun and he saw neither Lilic giving the gun to defendant nor defendant leaving the kitchen. He heard the commotion on the porch and went outside, where he saw Cordero. Defendant was standing and saying "Oh, my God, I shot him."

It was stipulated that Cordero died from a wound inflicted by a bullet from defendant's gun and that the gun had been found in a garbage can in accordance with defendant's statement to the police that he had run downstairs from Lilic's porch and thrown the gun into a garbage can.

The defendant then testified on his own behalf. He stated that he had

had a few drinks when he went to the house on Schiller Street. The argument there between him and Cordero was due to the fact that defendant had lent $2 to Cordero and Cordero had purchased a six-pack of beer with it. Defendant placed the gun in a paper bag in his car's glove compartment when he drove everyone to Lilic's for the party, and brought the gun with him from the car when they arrived. Before defendant and Steve Szalaj played Russian roulette, they were "betting and goofing around" about jumping from the porch to the roof. Defendant and Steve Szalaj stopped playing with the gun at the insistence of the others in the group, and the gun was turned over to Lilic.

Defendant further testified that before going for the pizza he went into the apartment to ask Lilic to return the gun. As he was stepping down out of the kitchen onto the porch with his gun, defendant stated he stumbled or tripped on the table and landed with his back side up against the stairs. The gun discharged as he was getting up. He dropped the gun, grabbed Cordero and asked the others for help. Steve Szalaj and Felix helped defendant carry Cordero downstairs. Defendant placed his shirt under Cordero's head and Steve Szalaj gave Cordero first aid.

On cross-examination, defendant testified that he had been drinking "quite a bit." He had been drinking both beer and hard liquor, and had started drinking with Steve Szalaj earlier in the day before the group got together on Schiller Street. Before Felix had fired the gun on Schiller Street defendant had drunk about three bottles of beer and two shots of whiskey. He had two drinks of hard liquor at Lilic's. When the gun went off, defendant testified, it was in his hand, but he did not remember if he had cocked it. The gun was in his palm with his fingers around the handle of the gun and the bottom of the trigger. His finger was not on the trigger and his thumb was over the hammer.

When defendant concluded his case, the State declined to present any rebuttal and the trial court began to state its findings. Defendant did not interject a request for closing argument. At the sentencing hearing, defendant presented a written motion for new trial. No request for oral argument was made and the motion was denied without hearing or argument.

OPINION

Defendant first contends that he was not proven guilty beyond a reasonable doubt in that the trial court was not convinced that the act which caused Cordero's death was of a reckless nature.

Section 9—3(a) of the Criminal Code of 1961 provides in pertinent part:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he

performs them recklessly, * * *." Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a).

Recklessness is defined in section 4—6 of the Code, which states:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. * * *." Ill. Rev. Stat. 1975, ch. 38, par. 4—6.

Defendant relies solely upon *People v. Spani* (3d Dist. 1977), 46 Ill. App. 3d 777, 361 N.E.2d 377, in maintaining that the trial court believed that defendant's acts were accidental rather than reckless, and that it thus applied the wrong standard in finding defendant guilty.

In *Spani* the defendant was found guilty of involuntary manslaughter in a bench trial. On appeal, the court concerned itself more with the trial judge's remarks than with an analysis of the evidence. The trial judge had commented several times during both the trial and the sentencing hearing that the shooting was an accident. In addition, the trial judge's remarks indicated that he considered involuntary manslaughter to be accidental and unintentional. In reversing the conviction, the court noted that the trial judge had clearly found the death to be an accident and that accidental conduct cannot be equated with the recklessness which is a requisite element of involuntary manslaughter.

■■ In the instant case, defendant maintains that the trial judge's statement that "maybe this was an accident and maybe it wasn't" shows that the trial court was not convinced beyond a reasonable doubt that the shooting death was accidental. We do not agree. Defendant concedes that the trial judge never stated that the shooting was an accident, as did the trial judge in *Spani*, and there are no repeated references, as there, that the trial judge considered Cordero's death an accident. On the contrary, the only reference to an "accident" by the trial judge in the instant case occurred in the quote cited above by defendant. Moreover, the quote was taken out of context. It prefaced the trial court's findings, in which the judge went on to say: "But there is no question in the court's mind that David is guilty as charged, no question." The trial court was obviously convinced beyond a reasonable doubt that defendant was guilty.

The trial court's findings are further supported by the evidence adduced at the trial. Defendant admitted bringing the gun to the party. He admitted drinking "quite a bit" of both beer and hard liquor. He further admitted that he and Steve Szalaj had been joking about who could jump from Lilic's porch to the roof and that the two had unloaded the gun and played Russian roulette. It is undisputed that defendant had the gun, which he had reloaded, in his hand when Cordero was shot in the heart. Although defendant claims that he tripped and the gun discharged

as he was getting up, the trial court had weighed the testimony of the witnesses and did not find defendant's testimony to be credible.

Pointing a loaded gun at another has been found to constitute reckless conduct that will support a conviction for involuntary manslaughter. (See, e.g., *People v. Bauman* (1st Dist. 1975), 34 Ill. App. 3d 582, 340 N.E.2d 178; *People v. Carlton* (1st Dist. 1975), 26 Ill. App. 3d 995, 326 N.E.2d 100.) "The act becomes even more reckless when the one pointing the loaded gun is under the influence of intoxicating liquor." (*People v. Roberts* (1st Dist. 1976), 36 Ill. App. 3d 811, 819, 345 N.E.2d 132, 138.) Although there was no eyewitness testimony that defendant had pointed the gun at Cordero, the court could have so inferred from the stipulations regarding the location of the fatal wound and the absence of any evidence tending to show that the bullet may have ricocheted.

■■ Furthermore, merely drawing a loaded gun in the presence of others can also constitute reckless conduct. In *People v. Bembroy* (1st Dist. 1972), 4 Ill. App. 3d 522, 281 N.E.2d 389, this court upheld a conviction for involuntary manslaughter where a gun discharged accidentally while the defendant was crossing a room with the gun in his hand, finding that simply handling a loaded weapon in a small apartment while under the influence of alcohol creates an "unreasonable and unjustifiable risk" to the persons present. (4 Ill. App. 3d 522, 526.) Similarly, the drawing of a loaded gun from one's pocket while in a crowded tavern (*People v. Thomas* (5th Dist. 1972), 8 Ill. App. 3d 690, 290 N.E.2d 418), or while under the influence of alcohol and in close proximity to another individual (*People v. Rodgers* (4th Dist. 1971), 2 Ill. App. 3d 507, 276 N.E.2d 504), has been found to be a reckless act. In the instant case, defendant had been drinking for several hours and continued drinking at a party on a small porch with six other persons. The porch measured approximately 4 feet by 9 or 10 feet and had a table and some chairs on it. The gun was admittedly in defendant's hands when it went off, and we find that, under the circumstances, the trial court could properly find that defendant's acts in handling the gun were reckless and that defendant therefore was guilty beyond a reasonable doubt.

Defendant next contends that he was denied due process because the trial court did not allow him the opportunity to make closing arguments or to argue his motion for new trial.

The record discloses that upon the close of defendant's case and the State's decision not to offer any rebuttal testimony, the trial court began to announce its findings and continued without interruption or objection by either party. Defendant maintains that the trial court thus denied him the right to make a closing argument in violation of the principles enunciated in *Herring v. New York* (1975), 422 U.S. 853, 45 L. Ed. 2d 593, 95 S. Ct. 2550. Defendant further maintains that a closing argument was all the more necessary because of the weakness of the State's case.

In *Herring* the United States Supreme Court held unconstitutional a New York statute which gave the judge in a nonjury criminal trial the power to deny counsel any opportunity to make a final argument. This court had the opportunity to consider *Herring* in *People v. Daniels* (1st Dist. 1977), 51 Ill. App. 3d 545, 366 N.E.2d 1085. In *Daniels*, the trial court had entered a finding of guilty in a bench trial before any closing arguments were made. Upon objection by the defendant, the trial court withdrew its finding, allowed closing argument, and again entered a finding of guilty. Such procedure was found to be proper under *Herring*.

■■ In the instant case, no attempt was made to seek closing argument. We are not convinced by defendant's contention that it would have been futile to do so. As in *Daniels*, a finding may be withdrawn to allow closing arguments. The court in *Herring* acknowledged that the right to closing argument can be waived. (422 U.S. 853, 860, 45 L. Ed. 2d 593, 599, 95 S. Ct. 2550, 2554.) Furthermore, defendant has not made any claim that the court's conduct of the trial was otherwise prejudicial. Under the circumstances, we cannot find that the trial court's actions, in the absence of any request or other indication of record, constituted a denial of an opportunity to make a closing argument. Nor can we agree that a closing argument was necessary because the State's case was weak. Clearly there was little dispute among any of the witnesses, including the defendant himself, as to what had occurred.

■■■ Finally, turning to defendant's contention that it was error to refuse argument on his motion for new trial, we find that argument was not required in the instant case. Defendant concedes that refusal of argument is not an abuse of discretion where the trial is short and the issues are few and simple. (*People v. Sally* (1959), 17 Ill. 2d 578, 162 N.E.2d 396, *cert. denied* (1960), 362 U.S. 981, 4 L. Ed. 2d 1017, 80 S. Ct. 1069; *People v. Moretti* (1928), 330 Ill. 422, 161 N.E. 766.) Moreover, where there is no reversible error committed in the course of the trial, the refusal to hear argument on a motion for new trial cannot injure defendant. (See *People v. Gambino* (1957), 12 Ill. 2d 29, 39, 145 N.E.2d 42, 48, *cert. denied* (1958), 356 U.S. 904, 2 L. Ed. 2d 582, 78 S. Ct. 566, and cases cited therein.) The issues in the case were not complex, but rather centered upon the credibility of the witnesses, and no reversible error other than the denial of closing arguments has been claimed by defendant in the course of the trial. We therefore conclude that the refusal to hear arguments on the motion for new trial did not constitute a denial of due process.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.