THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GEORGE SMITH, Defendant-Appellant.

First District (1st Division)   No. 1—88—0869

Opinion filed December 31, 1990.

BUCKLEY, P.J., dissenting.

Ambrose & Cushing, P.C., of Chicago (John C. Ambrose, of counsel), for
appellant.

Cecil A. Partee, State's Attorney, of Chicago (Noreen M. Daly, Special
Assistant State's Attorney, and Renee Goldfarb and James E. Fitzgerald,
Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:
Following a jury trial, defendant, George Smith, was convicted of

involuntary manslaughter (Ill. Rev. Stat. 1989, ch. 38, par. 9—3) in the shooting of his wife, Carolyn Smith, and sentenced to one year of periodic imprisonment and 30 months' probation with one year of supervision. On appeal, defendant contends that: (1) he was not proved guilty of involuntary manslaughter beyond a reasonable doubt; (2) the State's opening statement distorted the evidence and prejudiced the jury, thereby denying defendant his constitutional right to a fair trial; (3) the trial court erred in allowing Officer Schwab to testify as to a prior inconsistent statement he had made; (4) the trial court erred in denying defendant's motion for a mistrial predicated on the State's violation of the court's order *in limine* which prohibited evidence that defendant had been drinking unless there was evidence of intoxication; (5) the trial court erred in not allowing defendant's jury instruction which stated that if intoxication had not been proved beyond a reasonable doubt, evidence as to the fact defendant had been drinking could not be considered; and (6) the trial court erred in denying defendant's motion to suppress evidence of the gun acquired at the scene of the shooting. For the following reasons, the judgment of the trial court is reversed.

The record indicates that in the late afternoon of October 9, 1986, defendant was bowling with his weekly bowling league team at Rolling Lanes in Countryside, Illinois. Carolyn arrived at the bowling alley during defendant's last game. After the last game, defendant and Carolyn joined some friends in the bowling alley lounge and danced, drank and played darts until approximately 11 p.m. They then drove the one-half block distance home. Although they had planned to go out to get something to eat, Carolyn changed her mind and suggested that they just stay home and pack a few more things. They had been packing to move into their new home and were going out of town for the weekend. They then packed a few figurines and were going to pack the guns next.

Defendant went into the bedroom, took Carolyn's gun from the dresser drawer and told her to unload it while he got some boxes. However, because she always had trouble unloading the gun, Carolyn asked defendant to do it. While kneeling down next to Carolyn, who was sitting in a chair, defendant attempted to release the latch to unload the bullets when the gun fired and flew out of his hand. He looked at Carolyn and saw a little trickle of blood on her face. When she did not move after he repeatedly called her name, defendant called the paramedics and told them there had been a gunshot wound.

When the paramedics arrived, defendant was waiting for them in front of the building and preceded them up the three flights of stairs

to his apartment. While the paramedics were working on Carolyn, defendant was very excited and even attempted to stop them from inserting a tube into her mouth, thinking that they were hurting her. When the police arrived, they tried to subdue defendant and to move him away from his wife's side. At that point, defendant began to struggle with them and appeared to be out of control. As a result, the police had to handcuff him. When the police asked defendant where the gun was, he told them he had thrown it under the couch because he was scared of it. Defendant kept repeating that it had been an accident.

Although defendant wanted to accompany his wife to the hospital, the police drove him to the police station instead and placed him in a holding room. After several minutes, Detective Bozzi of the Countryside police department arrived and defendant told him that he wanted to see his wife. Bozzi then told defendant that his wife was dead. At that point, defendant began pounding the table with his fists and hitting his head on the floor. Bozzi did not ask him any further questions at that time. Defendant was then taken to another holding room, where he was left sitting on the floor for several hours. After further questioning, defendant was placed in a cell.

Office Mark Battaglia of the Countryside police department testified that on October 10, 1986, approximately 12:30 a.m., he responded to a radio call to proceed to defendant's apartment. When he arrived, he saw Carolyn lying on the floor and a paramedic working on her. There was an extreme amount of blood around Carolyn's face. Battaglia also saw defendant kneeling next to Carolyn, with his hands on his knees. He was emotionally upset, smelled strongly of alcohol, and had bloodshot eyes. Defendant's speech was very loud and slurred and he kept repeating that it had been an accident. When the paramedics attempted to put a tube in Carolyn's mouth, defendant grabbed the tube away. Battaglia told defendant to let the paramedics work on her. When Battaglia asked defendant where the weapon was, defendant told him that he had become scared and had thrown the gun under the couch. When another officer lifted the couch, Battaglia found the gun.

When Battaglia attempted to remove defendant from the area, defendant became violent, started shouting profanities at him and struggling. Battaglia stated that based upon his experience as a police officer, he believed that defendant was under the influence of alcohol at the time. On cross-examination, Battaglia indicated that he had not made any notations in his report that defendant smelled of alcohol or that his speech was slurred. In addition, defendant was not asked to

submit to a blood-alcohol test or to a breathalyzer test. Battaglia did not notice that defendant had had any trouble maintaining his balance.

Countryside police officer Schwab testified that on October 10, 1986, approximately 12:34 a.m., he was dispatched to defendant's apartment. When he arrived, paramedics were attending to Carolyn. Defendant kept repeating, "It was an accident" and "help my wife." At two points, he attempted to grab the airway apparatus away from the paramedics. When the police attempted to subdue defendant, he began to struggle and they had to handcuff him to restrain him. Officer Schwab smelled alcohol on defendant's breath and noticed that his speech was loud and slurred. In Officer Schwab's opinion, defendant had been intoxicated. On cross-examination, Officer Schwab admitted that he had not indicated in his report that defendant had been intoxicated, and in contradiction to his testimony on direct, stated that he was not certain that defendant had been intoxicated.

James Wuitteman, paramedic/fire fighter, testified that on October 10, 1986, approximately 12:31 a.m., he and his partner, Chris Schuler, were dispatched to defendant's apartment to treat a gunshot wound. When they arrived at the apartment building, they saw defendant standing in front of the building, waving. While they were walking up the stairs, defendant told them that his wife had shot herself. His speech appeared to be slurred. When they entered the apartment, they saw a middle-aged woman sitting in a chair, with blood over her face, blouse and hands and on the chair. Her hands were crossed on her lap and her feet were crossed at the ankles. She had no pulse. Wuitteman also noticed that her hands appeared to have abrasions on them.

The paramedics then laid Carolyn on the floor and they commenced CPR techniques. Wuitteman could not understand what defendant was saying at the time. Two police officers then arrived. The defendant kept interfering with the paramedics' work until the police restrained him. More paramedics arrived and they transported Carolyn to the hospital. On cross-examination, Wuitteman stated that when he heard the initial call come in from defendant, he noticed that defendant's voice was slurred. However, he never indicated this observation in his report.

Debbie Smith testified on behalf of defendant that she had known defendant for approximately three years and had known Carolyn for approximately two years. Debbie's husband, Bruce, and defendant worked together at Reynolds Aluminum. On October 9, 1986, Debbie had gone to the Rolling Lanes bowling alley to watch her husband

bowl on the Reynolds' men's league. Defendant also bowled in that league. The bowling ended approximately 6:30 p.m. and several of the bowlers and their wives went to the bowling alley lounge. Defendant and Carolyn were there and appeared to be very happy because the deal on their new house had gone through and they were going away for the weekend. Defendant and Carolyn danced together and defendant also played darts. Debbie and her husband left the bowling alley approximately 9:30 p.m. Defendant and Carolyn were still there. In her opinion, defendant was not intoxicated.

Next, Frank Borgman testified that he had known defendant for approximately six years through work and work-related social events such as the bowling league. After bowling on October 9, Borgman went into the bar area with defendant, Carolyn and other bowling league members and spouses. Defendant and Carolyn were dancing and seemed very happy. Defendant was playing darts against Borgman and beat him. In Borgman's opinion, defendant was not intoxicated. Borgman left the bowling alley approximately 10:30 p.m.

Countryside detective Frank Bozzi testified that on October 10, 1986, approximately 12:40 a.m., he was called into the police station to interview defendant. He was with defendant approximately five minutes. The first thing he noticed was that defendant's pants were wet in the front and there was liquid on the floor. When he said to defendant, "You urinated in your pants," defendant replied, "Well, I had no place to go to the washroom."

Bozzi then went to defendant's apartment where a police officer gave him the weapon. He then observed the chair in which Carolyn had been sitting and noticed a hole in the headrest area from where he retrieved the bullet. Later that morning, approximately 4:40 a.m., he returned to the station to interview defendant. Defendant then told him that he had had three mixed drinks while he was bowling and then had had five more drinks in the bar. Defendant explained that the gun had accidentally discharged. Bozzi could not determine whether defendant was intoxicated. He could not smell alcohol on his breath.

Bruce Smith, a co-worker of defendant, then testified that on October 9, 1986, he was at Rolling Lanes bowling alley with his wife, defendant and Carolyn. After the league games were completed, he talked to defendant in the bar about buying a house. In Bruce's opinion, defendant was not intoxicated.

Next, Frank Esposito, defendant's apartment neighbor, testified that on October 10, 1986, shortly after midnight, he had heard a loud bang and then a loud male scream. When he looked out of the peep-

hole in his front door, he heard a man crying in the hallway. He then heard defendant come out of his apartment, go down the stairs, say "gunshot wound on the third floor," and then come back up the stairs, followed by the paramedics.

Defendant then testified in his own behalf that after bowling on October 9, 1986, he and Carolyn went into the lounge and talked, danced and played darts. They left at approximately 11 p.m. Defendant denied telling Detective Bozzi that he had had eight alcoholic drinks that night. When defendant removed Carolyn's gun from her drawer, he did not notice that it was cocked. However, defendant testified that the gun had been put away in the cocked position because Carolyn had trouble shooting the gun otherwise. When the gun was in that position, the slightest touch could cause it to fire. He then carried the gun into the living room and was handing it to Carolyn while simultaneously releasing the latch to unload the bullets when the gun fired. Defendant stated that Carolyn was reaching up toward the gun at the time it went off. He denied having had his finger on the trigger.

Following closing arguments, the jury entered a verdict of guilty on the charge of involuntary manslaughter. Defendant was sentenced to one year of periodic imprisonment and 30 months' probation with one year of supervision by the intensive probation unit. Defendant's timely appeal followed.

Initially, defendant contends that the State failed to prove him guilty of involuntary manslaughter beyond a reasonable doubt on the grounds that: (1) the evidence that he was intoxicated at the time of the shooting was unsupported, contradicted and based on insinuations; and (2) the State failed to show that defendant's actions were likely to cause death or grossly differed from proper standards of conduct.

A person commits involuntary manslaughter when he "unintentionally kills an individual without lawful justification *** [and] his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***. In cases involving reckless homicide, being under the influence of alcohol or any other drug or drugs at the time of the alleged violation shall be *prima facie* evidence of a reckless act." (Ill. Rev. Stat. 1987, ch. 38, pars. 9—3(a), (b).) Reckless conduct occurs when a person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1987, ch.

38, par. 4—6.) The mental state of recklessness is to be inferred from all of the facts and circumstances in the record (*People v. McDermott* (1985), 141 Ill. App. 3d 996, 490 N.E.2d 1293), and it is incumbent upon the trier of fact to resolve all issues arising from these facts and circumstances on the theory of innocence, not guilt. (*People v. Ibom* (1962), 25 Ill. 2d 585, 185 N.E.2d 690.) The particular acts relied upon to sustain a charge of recklessness are a part of the nature and elements of the offense and must be proved beyond a reasonable doubt. (See *People v. Chambers* (1972), 8 Ill. App. 3d 430, 289 N.E.2d 476.) Although recklessness is a fact question (*People v. McDermott*, 141 Ill. App. 3d 996, 490 N.E.2d 1293), where the record leaves a grave and substantial doubt as to the defendant's guilt, the reviewing court will reverse the conviction. (*People v. Ibom*, 25 Ill. 2d 585, 185 N.E.2d 690.) In the present case, the State's allegation of recklessness is predicated on intoxication and the discharge of a loaded gun pointed at another. Because these acts are relied upon to prove recklessness, they must be established beyond a reasonable doubt.

The following evidence was admitted regarding the issue of whether defendant had been intoxicated on the night of the shooting. Debbie Smith, Bruce Smith and Frank Borgman testified that they were with defendant and Carolyn on the evening of October 9, 1986 at Rolling Lanes bowling alley. Defendant bowled in a men's bowling league with Bruce and Frank, co-workers at Reynolds Aluminum. Approximately 6:30 p.m., when the bowling games were completed, the men and their spouses went to the bowling alley lounge to talk, to dance and to play darts. Defendant beat Frank at darts, discussed the closing on their new home with Bruce, and danced with Carolyn. Bruce and Debbie Smith left the bowling alley approximately 9:30 p.m. Frank left approximately 10:30 p.m., and defendant and Carolyn left about one-half hour later. During the bowling games and while visiting in the lounge, Frank, Bruce, Debbie, Carolyn and defendant were drinking. Frank stated that he had been drinking Coke and did not know what the others had been drinking. Defendant denied telling the police officers on the night of his arrest that he had had eight mixed drinks from 4 p.m. to 11 p.m. However, he did state that he had had a few mixed drinks along with other beverages. Frank, Bruce and Debbie testified that when they left defendant that night, he was not intoxicated.

Countryside police officer Battaglia testified that when he arrived at defendant's apartment, defendant was emotionally upset, smelled strongly of alcohol, had bloodshot eyes, and his speech was loud and slurred. Further, defendant had to be restrained because he was inter-

fering with the paramedics. When the officers tried to restrain him, defendant began to struggle. Battaglia stated that, in his opinion, defendant was intoxicated. However, he had not made any such notation in his report and defendant did not appear to be having any trouble maintaining his balance.

Police officer Schwab also testified that he could smell alcohol on defendant's breath and that his speech was loud and slurred. During direct examination, Schwab stated that, in his opinion, defendant had been intoxicated. However, during cross-examination, Schwab stated that he was not certain that defendant had been intoxicated. Schwab further stated that defendant had told him that he had had eight mixed drinks that night.

Paramedics Wuitteman and Schuler testified that defendant's voice appeared to be slurred, but neither gave an opinion as to intoxication. Finally, Detective Bozzi, who had interviewed defendant at the police station, testified that defendant had urinated in his pants while he was waiting in the first holding room, but he could not make a determination as to whether he was intoxicated.

As the preceding testimony indicates, out of the testimony of three police officers, two paramedics and three friends of defendant, only one police officer unequivocally stated that, in his opinion, defendant had been intoxicated. One police officer stated that he could not make a determination, and another police officer vacillated as to his opinion. The paramedics did not give an opinion as to defendant's condition, and all three friends stated that defendant had not been intoxicated. Further, the lone opinion of intoxication was based on the smell of alcohol on defendant's breath, his loud and slurred speech, and his erratic behavior.

■■ It is well established that testimony that the breath of an accused smelled of liquor is not sufficient by itself to prove intoxication. (*People v. Thomas* (1975), 34 Ill. App. 3d 578, 340 N.E.2d 174.) Furthermore, when an accused's physical condition can be rationally explained as the result of conditions other than intoxication, such as physical or emotional trauma, a reasonable doubt of intoxication arises. See *People v. Thomas* (1975), 34 Ill. App. 3d 578, 340 N.E.2d 174; *People v. Winfield* (1973), 15 Ill. App. 3d 688, 304 N.E.2d 693.

In *Thomas*, defendant was convicted of driving while under the influence of alcohol. At trial, defendant testified that approximately 3 p.m. on March 25, 1974, he stopped at a tavern, had one beer and ordered a second beer. After that, he remembered nothing for a period of one month. In the early morning of March 27, two Chicago police officers found defendant in his car. The car was wrapped around a

light pole. The defendant was behind the wheel, the key was in the ignition, the motor was running, and the doors were closed.

One officer testified that there was a strong odor of alcohol on defendant's breath, defendant's face and eyes were red, he was uncooperative, he swayed slightly while walking to the squad car, and his speech was slurred. The officer stated that, in his opinion, defendant was under the influence of intoxicating beverages. Three days later, defendant was taken to the hospital where it was discovered that he had a blood clot on the left side of his brain which required surgery. The officer further testified that while at the police station, defendant had told him that he had been drinking beer and shots of whiskey.

Defendant's wife testified that when defendant failed to return home, she went to the tavern, and the bartender told her that defendant had fallen off of a bar stool and had hit the back of his head on the floor. The bartender had then helped defendant to a booth, where he slept for a while.

In reversing the trial court's conviction, the *Thomas* court stated that all of the symptoms observed by the police officer, *i.e.*, slurred speech, unsure balance and bloodshot eyes, could have been caused by the head injury or by the traumatic impact of the accident. Therefore, there was reasonable doubt as to defendant's intoxication.

■ In the present case, although there was no evidence of physical injury to defendant, there is ample evidence as to the emotional trauma he was experiencing as the result of his wife's condition. The slurred speech, bloodshot eyes and erratic behavior are readily explainable as the effects of severe emotional stress. As stated, the mere fact that his breath smelled of alcohol is insufficient to establish intoxication. (*People v. Thomas*, 34 Ill. App. 3d 578, 340 N.E.2d 174.) Accordingly, we find that the State failed to prove that defendant had been intoxicated beyond a reasonable doubt.

■ Defendant further contends that there was no evidence regarding the shooting incident itself from which recklessness can be inferred. Defendant testified that he had not pointed the gun at his wife and had not pulled the trigger. Instead, he had carried the gun into the living room from the bedroom by the butt of the gun, carrying it down by his side. When he approached the chair in which his wife was sitting, he started to kneel down next to her while he was attempting to pull back the latch to unload the bullets. Defendant stated that his wife was reaching toward the gun when the gun fired.

The State argues that the intentional discharge of a loaded gun pointed at another constitutes a conscious disregard of a substantial and unjustifiable risk and, therefore, constitutes reckless conduct. In

support of this argument, the State relies on *People v. Roberts* (1976), 36 Ill. App. 3d 811, 345 N.E.2d 132, *People v. Chew* (1977), 45 Ill. App. 3d 1024, 360 N.E.2d 417, *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389, *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59, and *People v. Andersch* (1982), 107 Ill. App. 3d 810, 438 N.E.2d 482. With the exception of *Bembroy*, in each of the aforementioned cases, the defendant was deliberately pointing the gun at the victim. In *Bembroy*, defendant was carrying a loaded gun across the room with his finger on the trigger. The gun was pointed at his daughter when it discharged.

In the present case, there is no evidence that defendant was deliberately pointing the gun at his wife. The State argues that if the bullet hit her in the face, then the gun had to have been pointed at her. While this is obviously true, there is no evidence that he was deliberately pointing it at her. Instead, he was getting ready to hand it to her after he unloaded the bullets. If the State's reasoning were to be followed, then every accidental shooting would constitute involuntary manslaughter because in order for a person to be wounded by a bullet, the gun has to have been pointed in that person's direction.

The situation in the present case is similar to that in *People v. Smith* (1973), 16 Ill. App. 3d 553, 306 N.E.2d 606. In *Smith*, defendant was found guilty of voluntary manslaughter in the shooting death of his wife. Defendant claimed that he had been cleaning his revolver with a handkerchief when he accidentally shot his wife. On appeal, the State confessed error as to defendant's conviction for voluntary manslaughter and requested the court to enter an order finding defendant guilty of involuntary manslaughter on the grounds that defendant had pointed a loaded gun at his wife in the presence of his four children, which act constituted a reckless act and a conscious disregard of a substantial and unjustified risk.

The *Smith* court agreed to review the evidence as to a conviction of involuntary manslaughter. In doing so, the court stated that it was incumbent upon the State to show that defendant's actions were grossly different from proper standards of conduct. After reviewing the record, the *Smith* court held that the evidence was insufficient to justify a finding that defendant's conduct had been reckless. In reaching this conclusion, the court stated:

> "The State's theory rests solely on an inference from the fact of the shooting. \*\*\* No eyewitnesses to the shooting were presented. While the State has introduced evidence which demonstrated that some of defendant's actions prior to the shooting may have been deliberate, there is nothing to show that defend-

ant's actions were reckless or that defendant's actions were likely to cause death. Nor was it demonstrated that defendant's actions were different from proper standards of conduct.

The sole evidence relating to the actual circumstances of the shooting comes from statements defendant made to the police officers. In these statements defendant asserts that while dusting his gun he accidentally shot his wife. We cannot exclusively infer from these statements, nor from the other evidence presented, that defendant pointed the gun at his wife. From this evidence it could just as easily be inferred that [the wife] moved in front of the gun at the moment the gun was discharged. While the trial court found against the defense of accident, we cannot say that when a person is dusting or handling a loaded gun in his own apartment, in the presence of others, and under the meager evidence here presented, that this is per se a reckless act." 16 Ill. App. 3d at 556-57.

In the present case, there is a similar lack of evidence. The State argues that the "strippling" on the victim's hands, wrists and fingers contradicts defendant's statement that the victim had had her hands on the gun at the time it was fired. However, the defendant did not state that the victim had had her hands on the gun. Instead, he stated that she was reaching for the gun. Contrary to the State's position, the "strippling" on the victim's hands would support this testimony.

The State further attempts to discredit defendant's testimony with the testimony of a firearms specialist who testified that the only way the gun would fire was to pull the trigger. Defendant had stated that he had not had his finger on the trigger and that he was unaware the gun was cocked. Similar testimony from a firearms specialist was introduced in *People v. Smith* (1973), 16 Ill. App. 3d 553, 306 N.E.2d 606. However, the *Smith* court held there was insufficient evidence to support a conviction of involuntary manslaughter.

The State also argues that defendant's testimony was improbable and contradicted. In this regard, the State compares the present case to *People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100, where there was evidence that the trigger pull was so hard, it was improbable the gun could have been accidentally fired; powder burns proved the gun had been held close to the victim's head; defendant had wiped his fingerprints from the gun; defendant had done nothing to help the victim and had not summoned medical help; and defendant had fled the scene. The *Carlton* facts are not remotely close to those at bar. Although defendant had thrown the gun under the couch, as soon as the police officers asked him where the weapon was, he told

them. The facts clearly demonstrate defendant's emotional anguish, his summons for help, his fear that the paramedics were hurting his wife and his reluctance to leave his wife's side.

Based on the facts present in this case, we conclude that the evidence was not so overwhelming or free from reasonable doubt as to support defendant's conviction of involuntary manslaughter. While defendant may have been negligent, without proof of intoxication or other circumstances, his conduct cannot be characterized as showing a conscious disregard of a substantial and unjustifiable risk which would constitute a gross deviation from the standard of care which a reasonable person would exercise under the circumstances. (*People v. Gosse* (1983), 119 Ill. App. 3d 733, 457 N.E.2d 129.) This determination obviates the need to address the remaining issues raised by defendant on appeal.

For the following reasons, the judgment of the trial court is reversed.

Reversed.

MANNING, J., concurs.

PRESIDING JUSTICE BUCKLEY, dissenting:
I dissent in this case because I believe the majority has wrongfully set aside a jury verdict of guilt that is supported by the evidence. I also take issue with the majority's premise that the State, in proving defendant's mental state, was required to prove that defendant was intoxicated beyond a reasonable doubt.

Defendant was charged with involuntary manslaughter. A person commits involuntary manslaughter when he "unintentionally kills an individual without lawful justification [and] his acts *** which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) A person is reckless or acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1985, ch. 38, par. 4—6.

My disagreement with the majority opinion centers on the State's burden of proof regarding the mental state of recklessness. The majority opinion asserts, without citation to or discussion of any authority, that because "the State's allegation of recklessness is predicated

on intoxication and the discharge of a loaded gun pointed at another[,] *** [these allegations] must be established beyond a reasonable doubt." (208 Ill. App. 3d at 544.) In my opinion, this assertion misstates the State's burden.

In this case, intoxication is not an element of involuntary manslaughter. Moreover, the indictment against defendant does not state that defendant's recklessness is predicated on defendant's intoxication. In fact, the word "intoxication" does not appear. It provides that defendant, "acting in a reckless manner[,] unintentionally shot and killed Carolyn Smith with a handgun, an act likely to cause death or great bodily harm, without lawful justification."

In presenting its case to the jury, the State's theory was that the mental state of recklessness could be inferred beyond a reasonable doubt from many factors, one of which was the evidence of defendant's intoxication. Other factors the jury could consider was that the gun was loaded and in a cocked position, that defendant was familiar with weapons, and that defendant was attempting to unload a cocked gun that was pointed at his wife sitting merely a few feet away. In other words, the State's theory was that under all the circumstances, including the evidence of defendant's intoxication, the victim's death was attributable to defendant's reckless conduct.

The State's theory and presentation of its case against defendant were consistent with Illinois law. In Illinois, evidence of an accused's intoxication is probative of recklessness (see, *e.g., People v. Gosse* (1983), 119 Ill. App. 3d 733, 736, 457 N.E.2d 129, 132) and is only one circumstance of many that a jury may consider in assessing a defendant's mental state (*People v. Bolar* (1982), 109 Ill. App. 3d 384, 440 N.E.2d 639, 645). As one court has stated:

> "The mental state of recklessness is to be inferred from all of the facts and circumstances in the record and whether the given conduct is reckless is a fact question for the trier of fact to decide." *People v. McDermott* (1985), 141 Ill. App. 3d 996, 1006, 490 N.E.2d 1293, 1300.

The majority's confusion over the State's proper burden of proof perhaps arises from the evidentiary posture this case took after the circuit court ruled on a defense motion *in limine*. Prior to · trial, defendant moved to bar the State from presenting any evidence in reference to defendant being intoxicated at the time of the shooting. This motion was granted in part; with the circuit court stating that no evidence of drinking would be allowed unless there was also evidence of defendant's intoxication. As discussed below, this ruling was well founded in Illinois law.

In *People v. Gosse* (1983), 119 Ill. App. 3d 733, 457 N.E.2d 129, defendant was found guilty by a jury of the crime of reckless conduct. The information charged that defendant's reckless conduct caused great bodily injury when his jeep flipped after he attempted to make a right-hand turn while travelling at an excessive rate of speed. The principal issue on appeal was whether the trial court erred in not granting defendant's motion *in limine* to exclude evidence of his consumption of alcohol and cannabis. After reviewing Illinois law on the issue, the court accepted the following rule:

"We favor a rule that would preclude the State from offering evidence of drinking alcoholic beverages or the use of narcotics without further evidence tying these facts to an inference of intoxication, *i.e.*, that the defendant's mental or physical faculties were impaired as a result of this consumption. We deem evidence of a nominal consumption of alcohol and cannabis without more or any showing that the defendant's mental and physical abilities were impaired is so inflammatory as to constitute reversible error. See *Wagner v. Zboncak* (1982), 111 Ill. App. 3d 268, 270, 443 N.E.2d 1085; *Parrish v. Donahue* (1982), 110 Ill. App. 3d 1081, 1085, 443 N.E.2d 786." *Gosse*, 119 Ill. App. 3d at 737, 457 N.E.2d at 132.

In ruling on defendant's motion *in limine*, the circuit court understood the teachings of *Gosse*. It allowed evidence that defendant drank that night only to the extent that this evidence was coupled with further evidence of defendant's intoxication. By so ruling, however, the circuit court did not place an additional burden on the State by requiring it to prove defendant's intoxication beyond a reasonable doubt. Indeed, in denying defendant's motion for a directed verdict, the circuit court specifically rejected defendant's argument that the State was required to prove defendant's intoxication beyond a reasonable doubt. It similarly acted at the jury instruction stage of the trial, again rejecting a proffered jury instruction that defendant's intoxication must be proven beyond a reasonable doubt.

Accordingly, I believe the majority opinion misstates the State's burden of proof regarding defendant's mental state. Illinois law does not require that defendant's intoxication be proven beyond a reasonable doubt. Rather, the evidence of defendant's intoxication, *i.e.*, evidence of an impairment of physical or mental abilities, was but one "circumstance" of many that the jury could consider in assessing defendant's mental state. This statement of the law was the one that the jury used in returning the verdict that it did, and my review of the record demonstrates that the jury's verdict is not so palpably con-

trary to the evidence as to create a reasonable doubt of guilt. *People v. Hawn* (1981), 99 Ill. App. 3d 334, 338, 425 N.E.2d 1024.

Paramedic James Wuitteman, one of the first people on the scene, testified that when he initially heard the defendant's voice on the radio, it was slurred. Paramedic Chris Schuler also testified to this effect. Wuitteman also testified that at the scene, defendant's speech was slurred, he walked slowly up the stairs when leading the paramedics up, and that while the paramedics were trying to assist the victim, he could not understand anything defendant was saying. He stated further that defendant became violent, yelled profanities, and while the paramedics were assisting his wife, he tried to pull out an intubation tube that the paramedics had inserted in her.

Patrolman Mark Battaglia, one of the first officers on the scene, testified that as soon as he arrived at the scene he could smell a strong odor of alcohol when near defendant, and that defendant's eyes were bloodshot and his speech was slurred and very loud. Based on these factors, Officer Battaglia testified that in his opinion defendant was intoxicated.

Officer Schwab's testimony also supported Officer Battaglia's. He too smelled alcohol and noticed that defendant's speech was slurred and loud. It was also Schwab's opinion that defendant as intoxicated. Furthermore, Schwab testified that reasoning with defendant was difficult.

Detective Bozzi testified that when he first observed defendant, defendant had urinated in his pants while situated in a holding room at the police station. This occurred shortly after defendant was removed from the scene. When defendant gave a statement four hours later that morning in Bozzi's presence, defendant admitted to drinking the evening of the shooting. Bozzi testified defendant admitted to him that he had at least eight drinks. Although defendant denies making that statement, he admits to drinking "some Seven and Sevens" that night.

Defendant argues that on the evening of the shooting he was in the company of friends and that their testimony was that he was not intoxicated. However, Bruce Smith had worked with defendant for approximately 15 years. Debra Smith, Bruce Smith's wife, testified that she had known defendant for three years. Frank Borgman also worked with defendant and had known him socially for six or seven years. This particular group had bowled together for some time. In light of these witnesses' long-standing relationships with defendant, it is possible that the jury found their testimony to be biased.

In addition, while these witnesses may have given an opinion that

defendant was not intoxicated, none of them were actually aware of how much alcohol defendant had consumed that night. On cross-examination, Debbie and Bruce Smith admitted that they had no idea how many drinks defendant had that evening. Also, during their stay at the bar, the Smith's admitted to drinking. Finally, the Smith's left the bar at 9:30 p.m., an hour and a half before defendant and his wife departed. Therefore, the Smith's would have no idea how many drinks defendant had after they left nor his condition.

Frank Borgman also admitted to drinking his four-hour stay in the bar. He also stated that he did not keep a close watch on defendant the whole time and that he had no idea how many drinks defendant had while bowling or after. Borgman stated that everyone in his group appeared to be "pretty happy" the night of the occurrence.

As for defendant's testimony, defendant stated that he began bowling at 4 p.m. After bowling, defendant and his wife joined a large group of their friends in the bar in the bowling alley. Defendant and his wife remained in the bar until 11 p.m.

When they reached home, defendant and his wife sat down and talked for a couple of minutes about going out of town in the morning. They then decided to pack their guns. Defendant stated that he went into his wife's dresser, reached into the drawer, and pulled out his wife's gun. He then took the gun into the living room so she could unload it. When his wife stated that she had trouble with unloading that gun, he offered to unload it for her.

After reentering the living room, defendant stated that he started to kneel down in front and to the right of his wife. He stated that as he was kneeling, he was trying to release the latch to the cylinder that held the bullets. He was not looking at the gun as he was beginning to unload it, but was instead looking at his wife. It was at that point that the gun "just went off."

Defendant admitted that he knew how to unload his wife's gun and had showed her how to do it in the past. He had had experience with different kinds of weapons and was a past member of the National Rifle Association. He had fired many different handguns a thousand times.

In a cocked position, defendant stated, a gun is dangerous; one need just touch the trigger and the gun will discharge. Defendant stated he knew that his wife's gun was loaded and that, in the past, she had left her gun in a cocked position because she had trouble pulling the trigger. Defendant testified that on the evening of the shooting, however, he did not actually see it in a cocked position since he just reached into the drawer and picked the gun up by the butt of the

gun. He further testified that he never looked at it while walking towards his wife in the living room—a 3-foot distance.

I believe that the above state of the record justifies the jury's finding that defendant acted recklessly. It was the jury's prerogative to resolve evidentiary conflicts as it did. (*People v. Gruner* (1985), 130 Ill. App. 3d 1042, 1048, 474 N.E.2d 1355, 1360.) It was the jury's function as trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from all the evidence. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 453, 473.) It is improper for this court to substitute its judgment for that of the jury. Additionally, to so act in this case would in effect ignore a string of cases upholding involuntary manslaughter convictions where the defendant was not *deliberately* pointing the gun at the victim when it unintentionally discharged. (See *People v. Moczarney* (1978), 65 Ill. App. 3d 410, 382 N.E.2d 544; *People v. Chew* (1977), 45 Ill. App. 3d 1024, 360 N.E.2d 417; *People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100; *People v. Tarpley* (1972), 8 Ill. App. 3d 960, 291 N.E.2d 262; *People v. Rodgers* (1971), 2 Ill. App. 3d 507, 276 N.E.2d 504; *People v. Thomas* (1971), 1 Ill. App. 3d 139, 275 N.E.2d 253.) Moreover, to so act would ignore certain peculiar circumstances presented to the jury, such as the 15-minute delay before the paramedics were summoned, defendant throwing the gun under the couch after it discharged, defendant claiming that his wife shot herself, and the fact that the victim's hands and feet were folded when the paramedics arrived despite the victim taking a close-range gunshot blast to the face. These circumstances are a reflection of the defendant's state of mind and are, in my opinion, consistent with my conclusion that the victim's death was caused by recklessness, rather than a negligent act as the majority opinion leads one to conclude.

Accordingly, for the foregoing reasons, I would affirm.